Adam B. Wolf (SBN 215914)
Catherine Cabalo (SBN 248198)
PEIFFER WOLF CAR KANE CONWAY &
WISE, LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-3592
Facsimile: (415) 402-0058
awolf@peifferwolf.com
ccabalo@peifferwolf.com

Paul L. Rein (SBN 43053)
Aaron M. Clefton (SBN 318680)
REIN & CLEFTON, Attorneys at Law
200 Lakeside Drive, Suite A
Oakland, CA 94612
Telephone: (510) 382-5001
Facsimile: (510) 832-4787
info@reinclefton.com

Irakli Karbelashvili (SBN 302971)
ALL ACCESS LAW GROUP
1400 Coleman Ave Ste F28
Santa Clara, CA 95050
Telephone: (408) 295-0137
Fax: (408) 295-0142
irakli@allaccesslawgroup.com

*Attorneys for Plaintiff*
*Christine DiBella*
*and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CHRISTINE DiBELLA,

Plaintiff,

v.

BOARD OF TRUSTEES OF THE
CALIFORNIA STATE UNIVERSITY;
COMPASS GROUP USA, INC. dba
CHARTWELLS HIGHER EDUCATION,

Defendants.

CASE NO. 5:21-cv-08461-BLF
Civil Rights

**FIRST AMENDED COMPLAINT FOR
PRELIMINARY AND PERMANENT
INJUNCTIVE RELIEF, DECLARATORY
RELIEF, AND DAMAGES:**

1. Violation of Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 *et seq.*)
2. Violation of Title III of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 *et seq.*)
3. Violation of the Rehabilitation Act of 1973 (29 U.S.C. § 794)
4. Violation of the California Disabled Persons Act and California Government Code (Cal. Civil Code § 54 *et seq;* California Government Code §§ 4450 *et seq.*)
5. Violation of the California Disabled Persons Act and California Health & Safety Code (Cal. Civil Code § 54 *et seq;* California Health & Safety Code §§ 19955 *et seq.*)
6. Violation of the California Unruh Act (Cal. Civil Code §§ 51 and 52)
7. Violation of the Federal Fair Housing Act (42 U.S.C. § 3601 *et seq.*)

1.     This is a civil rights class action for discrimination based on disability. More particularly, this lawsuit challenges each of the Defendants' failure to provide accessible facilities, as well as Defendant Board of Trustees of the California State University's failure to provide an emergency evacuation plan at the schools within the California State University system ("CSU").

2.     Plaintiff Christine DiBella ("Plaintiff" or "Ms. DiBella") is physically disabled. She requires use of mobility aids and devices, including a wheelchair, walking sticks, and cane. She is a student at California State Polytechnic University, Humboldt (formerly Humboldt State University) ("Humboldt"), which is part of the CSU.

3.     Defendants denied Plaintiff accessible facilities at Humboldt.

4.     Plaintiff resides on campus in student housing. The most prominent—though hardly the only—accessibility issues that Plaintiff has encountered are the lack of an emergency evacuation plan to get her out of her third-floor dormitory room and other multistory locations she may be, should the elevators go out of service during an emergency, lack of any designated accessible parking in the lot closest to her residence hall (Del Norte), lack of accessible entrance to the dining hall, lack of accessible paths of travel in the dining hall, lack of accessible seating in the dining hall, and exclusion and failure to accommodate her for a welcoming social event for incoming students.

5.     Plaintiff transferred from City College of San Francisco to Humboldt to complete her bachelor's degree. Prior to beginning the semester, Plaintiff contacted Humboldt to inform them that she is a disabled student who often uses a power wheelchair for mobility. Humboldt assured Plaintiff that everything would be accessible to her when she arrived on campus. However, when Plaintiff began her term, on August 16, 2021, she found many things at Humboldt were inaccessible to her.

6.     According to CSU's 2017 "Fact Book," CSU is the nation's largest four-year public university system, with 23 campuses and eight off-campus centers. According to student statistics covering 2003- 2020 published on CSU's website, CSU had over 1,100 students each

1

year who self-identify as having a mobility disability and received services for students with disabilities through CSU.

7.    Many students like Plaintiff who have mobility disabilities reside in on-campus student housing and/or take classes that are located on floors that can only be accessed via stairs or an elevator. These students require emergency plans to ensure they will be able to be evacuated safely in case of an emergency, such as a fire or earthquake, or if fleeing an active shooter (the first directive in "run, hide, fight").

8.    The process of creating an emergency evacuation plan for mobility disabled students enrolled at a CSU school is readily available to Defendant Board of Trustees of the California State University ("Trustees") and would not fundamentally alter the nature of the Trustees' programs, services, or activities offered through CSU.

9.    Plaintiff and other disabled students have informed the Trustees numerous times that Humboldt and other CSU campuses lack necessary, required emergency evacuation plans, yet the Trustees have failed to make accommodations to ensure each campus has an appropriate plan.

10.    In addition to the fear and anxiety caused by the lack of an emergency evacuation plan for student housing and for classrooms at Humboldt, Plaintiff has encountered numerous architectural barriers in classrooms, the dining hall, and other areas of Humboldt.

11.    Plaintiff has informed Defendants that she has been forced to navigate around numerous architectural barriers at Humboldt and that such barriers have impeded her ability to access the programs, services, and activities at Humboldt, yet Defendants have failed to remove barriers and make accommodations to ensure each campus is accessible to students with mobility disabilities.

12.    By failing to ensure CSU campuses have appropriate evacuation plans and failing to remove architectural barriers at Humboldt, Defendants are violating basic requirements under both state and federal law.

13.    This Amended Complaint seeks declaratory and injunctive relief to remedy Defendants' unlawful policies and practices. Defendants must ensure that Plaintiff and the

2

proposed classes of individuals who have physical disabilities and require use of a mobility aid or device have appropriate emergency evacuation plans and that architectural barriers at Humboldt be removed.

14. Plaintiff was denied her rights to full and equal access at these facilities, and she was denied her civil rights under both California law and federal law. She continues to have her rights denied because these facilities were not, and are not now, properly accessible to physically disabled persons, including those who use wheelchairs.

15. Plaintiff seeks injunctive relief to require Defendants to adopt policies which provide persons with mobility impairments with the accessibility features required under federal and state laws. Plaintiff also seeks recovery of damages for her discriminatory experiences and denial of access and of civil rights, which denial is continuing as a result of Defendants' failure to provide disabled accessible facilities.

## JURISDICTION

16. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 for violations of federal law.

## VENUE

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). The primary real property which is the subject of this action is located in this district, and Plaintiff's causes of action arose in this district.

18. This case should be assigned to the Eureka intradistrict as the real property which is the subject of this action is located in this intradistrict and Plaintiffs' causes of action arose in this intradistrict.

## PARTIES

19. Plaintiff is a resident of Oakland, California. Plaintiff is a "person with a disability" or "physically handicapped person." Plaintiff has rheumatoid arthritis, which is a progressive condition affecting her joints, including her knees, hips, hands, feet, and shoulders. Plaintiff's rheumatoid arthritis severely limits her ability to ambulate. She often requires the use of a wheelchair, walking sticks, and/or cane for locomotion and relies on a service animal.

3

20. Plaintiff is unable to use portions of public facilities that are not accessible to mobility disabled persons, including those who require the use of a wheelchair, walking sticks, and/or cane. Plaintiff is entitled by permit from the State of California to park any vehicle that she drives or in which she is transported, in a designated and properly configured disabled accessible parking space. Plaintiff requires parking places that are properly accessible, located on an accessible path of travel, and proximate to the public entryways to public facilities that she uses.

21. CSU is a governmental entity that operates public universities throughout California, including Humboldt.

22. Defendant Trustees adopt and oversee the implementation of all policies throughout the entire CSU system, including Humboldt. Those policies include, *inter alia*, policies related to emergency plans and disabled access at CSU campuses.

23. At all times relevant to this Amended Complaint, Defendant Trustees was and is the owner, operator, lessor, and lessee of the businesses, properties, facilities and/or portions thereof of all CSU campuses, including Humboldt, which is located at 1 Harpst Street, Arcata, California.

24. Defendant Compass Group USA ("Compass") is a corporation organized under the laws of Delaware with its corporate headquarters located in Charlotte, North Carolina. Compass is and was a primary operator of the dining facility on campus and creates and/or maintains the physical and policy barriers to access at Humboldt's dining hall known as "the J" (aka Jolly Giant Commons), which have significantly affected Plaintiff.

## CLASS ALLEGATIONS AGAINST DEFENDANT TRUSTEES ONLY

25. Plaintiff brings this action individually and on behalf of all persons similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3).

26. **Class Definitions.** The three classes that Plaintiff seeks to represent are comprised of the following:

> **(a)** *Student Housing Emergency Plan Class*: All persons with mobility disabilities who: (a) are enrolled students at a CSU campus; (b) use wheelchairs, scooters,

4

or other mobility aids or devices; and (c) are residing or will attempt to reside in CSU student housing that is located on a floor that can only be accessed by use of stairs or an elevator during the three years prior to the filing of this Amended Complaint herein through the conclusion of this action. This class of persons seeks declaratory and injunctive relief.

**(b)** *Classroom Emergency Plan Class*: All persons with mobility disabilities who: (a) are enrolled students at a CSU campus; (b) use wheelchairs, scooters, or other mobility aids or devices; and (c) who are enrolled in a CSU class or will attempt to enroll in a CSU class that is located on a floor that can only be accessed by use of stairs or an elevator during the three years prior to the filing of this Amended Complaint herein through the conclusion of this action. This class of persons seeks declaratory and injunctive relief.

27. Excluded from the above-referenced class definitions are the officers, directors, and employees of the Trustees, and any of the Trustees' shareholders or other persons who hold a financial interest in the Trustees. Also excluded is any judge assigned to hear this case, the staff of any assigned judge, or any juror selected to hear this case.

28. This action is brought as a class action and may properly be so maintained pursuant to Federal Rule of Civil Procedure 23 and applicable case law. This action does not seek classwide recovery for damages, personal injuries or emotional distress that may have been caused by the Trustees' conduct alleged herein. Plaintiff seeks compensatory damages and damages for emotional distress for herself individually.

29. **Impracticability of Joinder (Numerosity).** The members of the proposed classes are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit both to the parties and to this Court. On information and belief, the number of persons who are within each of the classes above exceeds 500 persons. The number of persons in the class and their identities and addresses may be ascertained from the Trustees' records.

30. **Questions of Fact and Law Common to the Class.** All members of the classes

5

have been and continue to be denied their civil rights to full and equal access to, and use and enjoyment of, the services operated by the Trustees because of the violations of disability nondiscrimination laws alleged herein. There are numerous questions of law and fact common to the class, including, but not limited to, the following:

a. Whether the Trustees are discriminating against Plaintiff and members of the proposed classes in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") by failing to make their facilities, programs, services, and activities accessible to and usable by persons with mobility disabilities

b. Whether the Trustees' failure to ensure each CSU campus has an appropriate emergency plan for mobility disabled students violates Title II of the ADA, Section 504, and the FHA;

c. Whether Humboldt and its parking and related facilities comply with the 1991 ADA Standards for Accessible Design ("1991 Standards");

d. Whether Humboldt and its parking and related facilities comply with the 2010 ADA Standards for Accessible Design;

e. Whether Humboldt and its parking and related facilities comply with the Uniform Federal Accessibility Standards (UFAS);

f. Whether Humboldt and its parking and related facilities comply with A.S.A. (American Standards Association) Regulations;

g. Whether Trustees have made reasonable modifications in their policies and practices to ensure that mobility disabled students have full and equal access to CSU's facilities, programs, services, and activities;

h. Whether the Trustees, by their actions and omissions alleged herein, have engaged in a pattern and practice of discriminating against Plaintiff and other mobility disabled individuals in violation of applicable state and federal disability civil rights laws;

i. Whether the Trustees have, directly or through contractual or other arrangements,

6

utilized criteria or methods of administration of emergency management or practices that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability (28 C.F.R. § 35.130(b)(4)(i));

j.  Whether the Trustees have, directly or through contractual or other arrangements, utilized criteria or methods of administration of emergency management or practices that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of Trustees' own emergency management goals with respect to individuals with disabilities (28 C.F.R. § 35.130(b)(4)(ii));

k.  Whether Humboldt's housing facilities comply with the design and construction standards of the Federal Fair Housing Act (24 C.F.R. § 100.205); and

l.  Whether Plaintiff and the members of the putative classes are entitled to declaratory and/or injunctive relief, and the nature of such relief.

31.  **Typicality.** The claims of the named Plaintiff are typical of those of the class. Plaintiff's claims are typical of the claims of the proposed classes in the following ways: (a) Plaintiff is a member of the proposed class; (b) Plaintiff's claims arise from the same barriers, uniform policies, procedures, practices and course of conduct on the part of the Trustees; (c) Plaintiff's claims are based on the same legal and remedial theories as those of the proposed classes and involve similar factual circumstances; (d) the injuries suffered by the named Plaintiff are similar to the injuries suffered by the proposed class members; and (e) the relief sought herein will benefit the named Plaintiff and all class members alike. The claims of Plaintiff are typical of those of the proposed class of persons who enrolled at CSU schools and have mobility disabilities that require use of a wheelchair, walker, or cane.

32.  **Adequacy.** The named Plaintiff will fairly and adequately represent the interests of their respective classes. She has no interests adverse to the interests of other members of the proposed classes and has retained counsel who are competent and experienced in litigating complex class actions, including large-scale disability rights class action cases.

33.  **The Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(1).** Prosecuting separate actions by or against individual class members would create a risk

7

of (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; and (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

34. **The Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(2).** The Trustees have acted and refused to act on grounds generally applicable to the class, making the declaratory and injunctive relief sought on behalf of the class, as a whole, appropriate.

## FACTUAL STATEMENT

35. Plaintiff started her collegiate studies at City College of San Francisco. While she was attending City College of San Francisco, she did not encounter any significant accessibility issues. When she decided to transfer to Humboldt for her final year of college, she assumed that Humboldt would be prepared to provide her with accessible facilities and policies. However, from the moment she arrived on campus on August 16, 2021, it was clear that accessibility is not a priority for Humboldt or its food service purveyor Defendant Compass. Plaintiff experiences daily issues with access at her residence hall, the dining hall, and residential and campus life activities.

### Lack of Emergency Evacuation Plan and Equipment
### from Residence Hall and Other Campus Buildings

36. Prior to the beginning of the school year, Plaintiff was informed that she had been assigned to the third floor of the Del Norte residence hall for her on campus housing. She was concerned about living on the third floor of the building due to the possibility of power outages and other limitations affecting elevator operation during emergencies such as fires, or storms, which are increasingly prevalent in Northern California. Plaintiff contacted Humboldt to inquire about whether there was an evacuation plan for her to get out of the building in case of a fire or other emergency shut down of the elevator. Humboldt assured Plaintiff that a plan was in place for evacuating her in case of an emergency, but it refused to elaborate on what that plan was,

8

what equipment would be used, or who was trained on the plan to evacuate her from the building.

37.     Plaintiff arrived on campus on August 16, 2021. On September 14, 2021, Plaintiff's residence hall had a fire drill to practice Humboldt's evacuation plan. During the drill Plaintiff learned the evacuation plan for the Del Norte building is for everyone to exit the building and then meet at the nearby soccer field, College Creek Field. Unfortunately for Plaintiff, the only accessible entrance to College Creek Field requires her to travel from the opposite side of the field from her dorm room, while everyone else just has to walk a short distance from the exit of the building to an inaccessible entrance to the field.

38.     Further, during the fire drill, the elevators were on. Plaintiff was only able to exit the building independently because of this fact. During a real emergency, power to the elevator would automatically be terminated. Everyone would have to use the stairs to exit. Since Plaintiff is unable to climb stairs, she asked the Resident Assistant (RA) assigned to her floor what the protocol was for assisting her with evacuating during an emergency when the elevators were not functioning. The RA informed her that she was unaware of any evacuation equipment or procedure in place to assist Plaintiff with evacuation during an emergency.

39.     This news concerned Plaintiff since prior to the beginning of the school year, she had been assured by Humboldt that there was a plan in place and that training had been provided to those who would assist her in evacuating the building. On September 15, 2021, Plaintiff sent an email to Kim Coughlin-Lamphear to express her concern about the lack of evacuation plan and requesting that Humboldt provide her with a plan to exit the building in case of an elevator outage. On September 16, 2021, Plaintiff also sent an email to HSU Housing & Residence Life expressing her concern about the lack of emergency evacuation plan for her and requesting that they provide her with the plan. She received a response that her email had been "forwarded to the RLC of College Creek which is Lake Luther and Yashvin who is…in charge of the fire drill." However, as of the filing of this Amended Complaint, more than four months later, Plaintiff has still not been informed of the evacuation plan. The lack of an evacuation plan has caused Plaintiff daily stress and worry about what she would do during an emergency, especially during

the height of the California wildfire season.

40. Having had no meaningful response from or action taken by Humboldt for over a month, Plaintiff contacted the local Fire Marshall on October 25, 2021, to complain about the lack of emergency preparedness plan for herself as a disabled individual:

> I am a wheelchair user and student at Humboldt State University. I am housed on the 3rd floor of a dorm. I was misinformed about evacuation equipment prior to moving to campus. Once the first fire drill happened I found out that I am not included in emergency planning. The school was unable to locate any evacuation chairs nor do they have trained staff to use them. I have been asked to design my own emergency planning which is a lot to put on an undergraduate student who is paying to be here. The school has a list of students with special needs to provide to the fire department but this feels inadequate to me. I would like to know what kind of emergency preparedness is recommended or mandated by law. I would like to coordinate an evacuation plan with your expertise.

The State Fire Marshall, Shane Wilson, responded the same day to Plaintiff. He cited Humboldt for their failure to address the emergency planning issues for disabled students like Plaintiff. The State Fire Marshall directed Humboldt to relocate Plaintiff immediately:

> To bring you up to speed, the staff at HSU have been directed to move you to a safe location immediately. The egress in place is not sufficient for your needs and has been identified as non-compliant for non-ambulatory persons above ground level.

> At no time are you responsible to create any "Emergency or Evacuation Plans" for the campus. My office will coordinate with HSU to ensure this matter is addressed and that all emergency plans are updated to reflect needed changes.

Exhibit 1, Emails between Plaintiff and Shane Wilson. Humboldt relocated Plaintiff to a hotel off campus.

41. Humboldt has been on actual notice from former graduate student, Dawn Albrecht, who studied emergency preparedness for her master's degree at Humboldt in approximately 2012. Ms. Albrecht has over a decade of experience and knowledge of assessing risks for disabled persons in emergencies and emergency planning. She notified the school multiple times about the lack of emergency planning for disabled persons. As she wrote to Plaintiff on October 25, 2021:

Good evening, Christine.

> I am glad you contacted me. I spoke with administrators several years ago at HSU about my concerns for a lack of adequate planning for evacuating individuals with mobility issues from upper floors on campus and the fact that there was a lack of med sleds or other evacuation devices, or individuals trained to use them, or assigned to ensuring that all

10

individuals are able to be evacuated. Plus there is the problem with putting students on upper floors in the first place who cannot get out without using an elevator (which you never do in a fire).

I talked with folks on campus about this around 2014, I believe, as well as a couple years before that - back when Dorrie Lanning was involved in campus emergency preparedness. . . .

The fact that they would still put a student in a wheelchair on the third floor is ridiculous. Then they want to turn it around on YOU and make YOU responsible for their flawed building design, thoughtless room assignments, lack of adequate planning... I could go on, but it would do no good. Providing a list of students with disabilities to firefighters is inadequate and simply passing the buck instead of taking individual student needs into consideration.

Exhibit 2, Email to Plaintiff from Dawn Albrecht dated October 25, 2021.

42.     Plaintiff requested to be moved to a ground floor on October 18, 2021. On or about October 18, 2021, she met with Housing and Residence Area Coordinator Yashvin Madhak. At that meeting, Mr. Madhak informed Plaintiff that there was no policy or training regarding evacuation equipment, and that no equipment existed anywhere on campus. On information and belief and according to Mr. Madhak, five years ago, the emergency evacuation equipment which was on campus to assist disabled persons during an emergency was removed. Plaintiff was denied her request for a ground floor accommodation on October 20, 2021. It was not until the Fire Marshall *ordered* Humboldt to move Plaintiff to a safe location on October 25, 2021, that the Trustees did so.

43.     Plaintiff later moved to a first-floor room in the residence hall. The room was not comparable to the third-floor room. It was smaller in size, did not have a common area closet, and was not accessible in several respects. For example, the furniture in this room was arranged in such a way that Plaintiff had difficulty reaching the closet because the bed blocked the path of travel to the closet. The closet was also inaccessible to Plaintiff because the closet rod was out of reach. Furthermore, the bathroom was not accessible because the door swung out toward Plaintiff, thereby reducing the clear space for Plaintiff's wheelchair and blocking the entire hallway. The room was also too humid, and Plaintiff was unable to open the window to reduce the humidity because the furniture blocked Plaintiff's access to the window. Plaintiff tried to remedy these accessibility issues in the first-floor room by asking Humboldt if she could bring in

her own furniture, but this was not allowed.

44. After consultation with university officials and others, the Fire Marshall reversed his position on the safety of the third-floor residence room. As a result, Plaintiff was allowed to move back to her third-floor room. Despite the reversal of opinion, the emergency rescue area on the third floor remained inaccessible under ADA requirements, lacking two way-communication and having no evacuation chair or plans for evacuation if remaining in this area would be life threatening (fire or active shooter, for example). At the time Plaintiff was allowed back on the third floor, there was also no accessible path of travel to the emergency gathering area on the adjacent sports field to gather with other students as the designated evacuation route required the use of stairs.

45. Plaintiff learned that on February 3, 2022 Humboldt held a fire drill. Plaintiff was not informed of this fire drill in advance, and no one reached out to her regarding what she needs to do in case of an actual emergency. Plaintiff's evacuation needs were once again ignored.

46. Plaintiff's concerns about fire safety are not theoretical. In 2018, a Humboldt report states that there was a fire in the laundry area of Plaintiff's dorm. This fire was adjacent to the accessible egress and could have blocked the exit. Even after the fire, Humboldt did not act to create meaningfully accessible emergency procedures.

## Plaintiff's Experiences Are Typical of CSU's Emergency Management and Planning Failures for Persons with Disabilities

47. Plaintiff's experiences at Humboldt, with its lack of emergency policies, planning and preparedness, are typical of a systemic failure to comply with the ADA requirements for emergency planning for persons with disabilities, "when viewed in their entirety." A review of available online materials from the 23 different CSU campuses shows each one, with limited exceptions, has inadequate policies and procedures to meaningfully include persons with physical mobility disabilities in their emergency preparedness programs to lesser or greater degrees.

48. The impact across the state on students with disabilities given their overall numbers is significant. From 2003 to 2020, CSU has had over 1,100 enrolled students each year

12

who self-identify as having a mobility disability and received services for students with disabilities through CSU. Because these statistics are limited to students who self-identify and who received services for students with disabilities through CSU, the total number of mobility disabled students affected is likely much larger.

49.     The U.S. Department of Justice advises that there are at least four categories of emergency planning that must be addressed to make emergency preparedness programs accessible to persons with disabilities. "ADA Best Practices Tool Kit for State and Local Governments" available at https://www.ada.gov/pcatoolkit/chap7emergencymgmt.htm. Four essential components of best practices for emergency management include programs such as:

- **Preparation** – advance planning for emergencies and disasters;

- **Testing of Preparedness** – staging emergency simulations and other approaches to testing the effectiveness of emergency preparedness;

- **Notification** – alerting the public to emergencies and disasters and to available programs, services, and activities; and

- **Community Evacuation** – ensuring that the public can evacuate safely.

50.     The ADA requires that all these components of public emergency management and preparedness programs must be meaningfully accessible to persons with disabilities. ADA regulations since 1990 have emphasized that, "[b]ecause people with disabilities may visit, be employed or be a resident in any building, emergency management plans with specific provisions to ensure their safe evacuation also play an essential role in fire safety and life safety." 1991 Standards § A4.3.10 Egress. The Trustees have failed to provide this meaningful access throughout its system for several reasons based on facts described below.

### Lack of Preparation of Disabled Persons for Emergencies

51.     The Trustees fail to meaningfully plan for and prepare disabled persons for emergencies. Emergency planning at each campus is discriminatory from its inception on the face of many campus's Emergency Operation Plans. Nearly all campuses require disabled persons to develop some aspect of their own emergency plan. Such burdens often include requiring disabled persons themselves to find a "buddy" or "buddies" to help them with

13

evacuation, and to identify for themselves the areas of rescue, exits, and routes they must take in an emergency. In at least on instance, the written policy advice during active shooter scenario preparation is to find places to hide in advance themselves. In the event of an actual active shooter scenario, the policy advises self-soothing, with no more planning specified for how to properly shelter in place. In other instances, as a matter of written policy, several campuses place ultimate responsibility for *all* emergency evacuation responsibilities on the disabled person. Non-disabled persons are not required to develop their own emergency planning. Non-disabled persons get the benefit of extensive planning, practice drills, notification, and options for evacuation. For people with disabilities, even the options for self-planning are so limited as to endanger these individuals, and potentially others as well.

**Lack of Testing Preparedness for Persons with Disabilities**

52.     The Trustees fail to meaningfully test preparedness for emergencies for persons with disabilities on CSU campuses. Given that each disabled person must develop aspects of their own emergency plans, practicing those plans during broader emergency simulations appears to be deficient, or non-existent. Specifics of how disabled persons should be included in emergency simulations and drills is not specified in policies.

53.     At Humboldt, for example, Plaintiff was excluded from emergency drills entirely despite her advance requests on how to participate. When she tried to find "buddies" to assist her during emergencies at new student social events, she was denied the chance because the events were not accessible. For example, as described further below, a new student social hike was not accessible by wheelchair. Plaintiff asked in advance that these events be made accessible to her, but her requests were ignored. Additionally, there were no evacuation chairs or intercom systems or other tools for taking personal protective measures at areas of refuge at the time of the filing of the initial Complaint for Plaintiff to practice emergency evacuation simulations and testing. There is no evidence that any CSU campus meaningfully prepares for practicing use of emergency evacuation chairs with disabled persons.

54.     Despite Plaintiff requesting participation, she was denied it. While scheduled drills appear to exist for non-disabled persons, there is no indication from any documents online

14

that any CSU campus meaningfully coordinates testing with persons with disabilities or includes disabled persons in the design, control, or evaluation of their simulations.

### Lack of Notification for Emergency Planning for Persons with Disabilities

55.     There is insufficiently meaningful notification to disabled persons about how to voluntarily sign up for disaster preparedness lists that would aid emergency personnel to find and assist them. No such list was offered at Humboldt to Plaintiff, even when she specifically inquired about emergency planning prior to arriving on campus. No documents on any campus website give information to persons with disabilities about how they may participate in emergency simulations and drills.

56.     Across all campuses, disciplinary polices for failing to participate and leave buildings during emergency simulations do not provide an exception for disabled persons, yet the emergency plans and physical premises do not permit disabled persons to comply with the requirements, nominally subjecting them to discipline for not complying with evacuation requirements that the Trustees have made impossible for them to meet.

57.     The DOJ recommends that the best practice of emergency planning is that public entities develop confidential lists of persons with disabilities to provide them with access to emergency preparedness programs. However, each CSU campus website appears not to have any information about how to sign up for these lists, or if they exist at all. Similarly, new student handbooks do not indicate how to sign up for these lists, or if they exist at all. Emergency Operations Plans do not specify how the lists are kept confidential. This lack of notification to disabled persons is particularly concerning when combined with the Trustees placing the responsibility for planning on disabled persons themselves. Disabled persons are unaware how their own individual evacuation plans fit into the larger emergency management or testing.

### Lack of Safe Evacuation Options and Best Practices for Persons with Disabilities

58.     Safe means of egress is essential for meaningful emergency management programs for persons with disabilities. Without a safe means of egress, mobility impaired individuals may be unable to evacuate. To ensure a safe means of egress the Trustees must either provide a rehearsable plan for evacuating disabled persons from an accessible area of rescue with

15

two-way communication for persons with disabilities to reach rescue workers, or a similar plan that includes an evacuation chair that, with assistance of non-disabled persons, a person with a disability can use to exit safely. A safe means of egress is essential and indispensable part of accessible emergency planning and management. The best practice is to have both. For example, in the event of a power outage, or structural damage, the communication system may not be available. Therefore, without an alternative means of egress, a disabled person is in danger, alone, and stranded. An evacuation chair in every CSU building level above ground is necessary to ensure meaningful participation in emergency evacuation programs.

59. Contrary to the Trustee's representations after filing of the initial Complaint in this case that due to "liability concerns," many CSU campuses supposedly do not use evacuation chairs, this is not the case. Use of the emergency evacuation chairs at CSU campuses is irregular.

60. Humboldt itself represents in its emergency planning that it may use emergency evacuation chairs to aid mobilities impaired individuals with leaving buildings when an elevator is not operational, but none appear to exist on campus. Here, despite its own accessibility goals as to the use of evacuation chairs, Humboldt has failed to provide them. On information and belief, the entire CSU system, when viewed in its entirety, lacks a sufficient number of emergency evacuation chairs, and training on how to use them.

**Summary of Campus Emergency Management Policies:**

**Humboldt**

61. Preparedness Planning: Humboldt campus places the burden of establishing emergency planning for persons with disabilities on disabled persons. "Persons with mobility impairments or using wheelchairs should prepare for emergencies ahead of time by instructing classmates or faculty on how to assist her/him in case of emergency." https://risksafety.humboldt.edu/campus-emergency-preparedness.

62. The campus plans for emergencies, but the evacuation equipment it references in those plans is unavailable. No evacuation chairs existed anywhere on campus as of the filing of the initial Complaint, nor today. Yet, for example, the campus Emergency Operation Plan advises:

16

Do not attempt to move a person in a wheelchair by yourself; seek help. Ask if they want to move forward or backward down the stairs. Wheelchairs have many movable or weak parts. Some persons have no upper trunk or neck strength. Power wheelchairs have very heavy batteries; *an evacuation chair may be needed and the chair retrieved later*. If a seatbelt is available, use it!

Humboldt Emergency Operations Plan & Guidelines, p. 52 (emphasis added). The "2012 Building Evacuation Plan" template states: "Evacuation of Disabled & Special Populations. NOTE: *There are Evacuation Stair Chairs on campus* (If needed, request through Incident Command Post)." According to representatives of Defendant, no evacuation chairs exist on campus because they are a "liability issue." To the extent that Humboldt removed its evacuation chairs, such a decision would result in a decrease in accessibility that runs afoul of its accessibility goals, and more broadly, in violation of the ADA.

63. <u>Testing of Preparedness:</u> Plaintiff was not included in emergency drills and could not have done so even if invited due to lack of two-way communication systems and evacuation chairs.

64. <u>Notification:</u> Humboldt has no website information of how to sign up for emergency preparedness. The Student Handbook for residents states, "Students with documented disabilities are encouraged to register with the Student Disability Resource Center (SDRC)." Student Handbook at p. 4. But it does state how to sign up for emergency preparedness. By contrast, persons without disabilities are made aware of general emergency information for their dorms, for example, "Located on the back of your room door is an Emergency Information Card. This card provides you with important safety and evacuation information. Be sure to familiarize yourself with this emergency information and learn where all exits are located." *Id.* at 44. These cards contain no information for persons with disabilities about how to exit in an emergency, how to register for emergency programs, or the location of accessible areas of rescue. On information and belief, such disparity of treatment of disabled person participating in emergency planning is ubiquitous throughout all campus buildings.

65. <u>Evacuation Options:</u> Humboldt lacks emergency evacuation chairs and accessible areas of rescue.

17

66. <u>Number of Disabled Person</u>: According to the 2018 "Humboldt Emergency Operations Plan and Guidelines," "Over 720 students are registered with the Student Disability Resources Center, 65 students use the transportation service for mobility issues, and 101 students with temporary disabilities."

**Chico**

67. <u>Preparedness Planning</u>: Once a student self-identifies as disabled, an individual plan is developed.

68. <u>Testing of Preparedness</u>: Chico has no documents online indicating testing for persons with disabilities.

69. <u>Notification</u>: Chico has no information online about scheduling or frequency of testing or simulations, or how to sign up for the "buddy system" that it advises is best practice.

70. <u>Evacuation Options</u>: Chico has no information online about evacuation chairs, and on information and belief, no evacuation chairs are available. No areas of rescue are designated on emergency evacuation planning documents.

**Sacramento**

71. <u>Preparedness Planning</u>: Sacramento Campus policy states:

Individuals with an AFN [Access & Functional Needs] have the most awareness of their specific evacuation needs. ***It is the responsibility of the individual to plan ahead for emergencies***. Individuals with an AFN are encouraged to self-identify any disability, access or functional needs, and to work with faculty, staff, and students to identify evacuation routes, areas of refuge, and other emergency planning needs before an emergency occurs.

Emergency Operations Plan at p. 42-43 (emphasis added). There is no indication of how a disabled individual can integrate their plan with the overall Emergency Operations Plan.

72. <u>Testing of Preparedness</u>: ***Disabled persons are subjected to fines if they cannot exit the dorms***, but there is no indication in the student handbook how they should plan for how they can exit:

Evacuation drills will be held periodically in the residence halls. Whenever an alarm sounds, all residence hall occupants are required to evacuate the building immediately. It is a resident's responsibility to familiarize him or herself with evacuation routes and protocols. Emergency procedure protocols are posted in each resident's room. ***Residents who do not evacuate during a fire drill or alarm will be subject to disciplinary action***.

18

Residence Halls Policies and Procedures at p.15 (emphasis added).

73. <u>Notification:</u> Sacramento has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

74. <u>Evacuation Options:</u> Sacramento claims that it has 29 evacuation chairs.

**<u>Sonoma</u>**

75. <u>Preparedness Planning:</u> Sonoma has almost no information for planning for evacuating students of disabilities in available online materials. The evacuation policy merely states, "If you are unable to self-evacuate due to injury, disability, or other functional need, proceed to the nearest exit or stairwell, if possible, and call 911 to advise University Police of your location and need for assistance. Wait as long as it is safe to do so." Available at https://emergency.sonoma.edu/procedures/evacuation. This does not provide meaningful access to emergency planning services for person with disabilities.

76. For employees, Sonoma states that:

> Building Safety Marshals and Department Emergency Coordinators are responsible for encouraging employees who may have disabilities or access and functional needs to work with the department, Disabled Student Services or Employee ADA Services, and/or the Office of Emergency Services on individual plans to facilitate evacuation during fires. Employees and students are encouraged to self-report and request assistance since such needs cannot be identified visually.

https://emergency.sonoma.edu/planning-operations/emergency-plan. There is no plan for emergencies generally, only fires. There is no plan for students other than encouraging them to self-identify as disabled. However, there is no indication of who they should self-report to or whether this information will be properly protected as confidential.

77. <u>Testing of Preparedness:</u> Sonoma has a policy of holding a drill once per year but there is no documentation available about actual execution or review of results as to persons with disabilities.

78. <u>Notification:</u> Sonoma has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps

19

the campus takes to ensure disabled persons are included in emergency preparedness programs.

79. <u>Evacuation Options:</u> Sonoma has no information online about evacuation chairs, and on information and belief, no evacuation chairs are available. No areas of rescue are designated on emergency evacuation planning documents.

**Cal Maritime**

80. <u>Preparedness Planning:</u> The Campus Emergency Response Guide has no mention of persons with disabilities whatsoever. There is a separate document on the website, without a title, that has some information from campus police:

> Building Monitors should be aware of persons with disabilities in their areas and ensure that all such persons are successfully evacuated during an emergency. Appropriate evacuation procedures should be prearranged between the disabled individuals and the people assigned to assist them. Report immediately any person with disabilities that you were unable to evacuate.

Available at https://www.csum.edu/police-department/media/considerations-for-people-with-disabilities.pdf

81. At the time of filing of this Amended Complaint, the link to the student handbook was broken and therefore emergency evacuation information for disabled resident students not available online.

82. <u>Testing of Preparedness:</u> Cal Maritime has no information online indicating testing for persons with disabilities.

83. <u>Notification:</u> Cal Maritime has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

84. <u>Evacuation Options:</u> Cal Maritime has no information online about evacuation chairs, and on information and belief, no evacuation chairs are available. No areas of rescue are designated on emergency evacuation planning documents.

**Cal State East Bay**

85. <u>Preparedness Planning:</u> The Emergency Procedures Desk Reference guide states

that:

> Whenever there is a building evacuation, we must be aware of the potential needs of those who are disabled. The following information will alert you to the concerns of the disabled.
>
> ° Permanently disabled persons should prepare for emergencies ahead of time by instructing a classmate, instructor or fellow staff member on how to assist them in case of emergencies; . . .
>
> ° Wheelchair Bound. Consult with the individual to establish the best course of action. If it is necessary to wait for exits to clear, stay with them, or try to assign someone else to accompany them;
>
> °If stairs must be negotiated, disabled persons may find it best to leave their wheelchair behind, and be carried by two assistants, if possible;

California State University, East Bay Emergency Procedures Desk Reference, Page 4 of pdf (unnumbered in document).

86. The campus Emergency Operations Plan puts burden of establishing a "buddy" system on persons with disabilities:

> NOTE: It is suggested that persons with accessibility needs prepare for emergencies ahead of time:
> 1. Learn locations of exit stairways and Areas of Rescue and plan an escape route.
> 2. Use a buddy system by showing a classmate or instructor how to assist in case of emergency.
> 3. Persons who cannot speak loudly should carry a whistle or have some means for attracting attention.
> 4. Contact the Volunteer Team Leader

CSUEB Building Evacuation Procedures available at
https://www.csueastbay.edu/upd/files/docs/vtl/evacuation-procedures-2020.pdf

87. There is no mention of disabled student evacuation or identification in residence hall handbooks and materials online.

88. <u>Testing of Preparedness:</u> Cal State East Bay claims it conducts annual drills.

89. <u>Notification:</u> Cal State East Bay has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

90. <u>Evacuation Options:</u> Campus policies state this campus has evacuation chairs.

**San Francisco**

91. <u>Preparedness Planning:</u> San Francisco places the burden of responsibility for emergency planning on disabled persons:

> ***It is the responsibility of the individual to plan ahead for emergencies***. Individuals with an AFN [access or functional need] are encouraged to self-identify any disability, access or functional needs, and to work with faculty, staff, and students to identify evacuation routes, areas of refuge, and other emergency planning needs before an emergency occurs.

San Francisco State University Emergency Operations Plan (Revised October 2020), p. 41 (emphasis added). *See also* pages 45, 54, and 253 (repeating same burden).

92. San Francisco places the burden of establishing a buddy system on disabled persons. In active shooter situations, the campus policy advises self-soothing to remain calm, but does not assist persons with disabilities in establishing an active shooter emergency plan. It puts the entire burden for developing an emergency plan on the disabled individual:

> **INDIVIDUALS WITH ACCESS AND FUNCTIONAL NEEDS (AFN)**
>
> Depending on a person's specific disability or AFN, it may be difficult for individuals to hide. ***It is the responsibility of the individual to identify which techniques will better assist them during an emergency by***:
>
> • Planning ahead and identifying potential locations to hide in the workplace or classroom
>
> • Establishing a "buddy system", "Buddies" should educate partners regarding physical, psychological and communication assistance needed to increase their safety during an emergency
>
> • ***Practice*** [sic] ***self-soothing techniques to remain calm***.

*Id*. at p. 45 (emphasis added).

93. The Community Living Standards "How-To Guide" for students residing on campus has extensive information about evacuation for able bodied persons but nothing regarding how to do so for students with disabilities.  Available at https://housing.sfsu.edu/sites/default/files/Community_Living_Standards.pdf

94. <u>Testing of Preparedness:</u> San Francisco has no information online about testing of emergency planning for persons with disabilities.

22

95.     <u>Notification:</u> San Francisco has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or how to access emergency planning. However, "[t]he University maintains a list of students who have reported to have an access or functional need, maintained and regularly updated by the Office of Services to Students with Disabilities." San Francisco State University Emergency Operations Plan (Revised October 2020) at p. 54.

96.     <u>Evacuation Options:</u> San Francisco has no information online about evacuation chairs, and on information and belief, no evacuation chairs are available. No areas of rescue are designated on emergency evacuation planning documents.

**San Jose**

97.     <u>Preparedness Planning:</u> San Jose places the burden of developing an emergency plan squarely on the shoulders of disabled persons, "If you are disabled, make arrangements for assistance before an emergency." Emergency Information available at https://www.sjsu.edu/emergency/evacuation-procedures/assisting-people-disabilities.php. The campus assumes that persons with disabilities will find a "buddy" to assist them but does not provide any information about facilitating these connections.

98.     <u>Testing of Preparedness:</u> San Jose has no information online about testing of emergency planning for persons with disabilities.

99.     <u>Notification:</u> San Jose has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

100.    <u>Evacuation Options:</u> San Jose has no information online about evacuation chairs, and on information and belief, no evacuation chairs are available. No areas of rescue are designated on emergency evacuation planning documents.

**Stanislaus**

101.    <u>Preparedness Planning:</u> Stanislaus puts the burden of developing an emergency evacuation plan and buddy system for the disabled student on the disabled students themselves, "If you have a disability or access and functional need, ***it is important that <u>you</u> establish a***

23

***"buddy system" and educate them regarding the type of assistance needed to evacuate during***

***an emergency or disaster****.*" https://www.csustan.edu/emergency/evacuation (emphasis added).

The sentiment is repeated in the Emergency Operations Plan:

> ***It is the responsibility of the [disabled] individual to plan ahead for emergencies*** and
> inform a University Official or employee regarding any needs in accommodation and
> establish a "buddy system" with coworkers. "Buddies" should educate partners regarding
> physical, psychological and communication assistance needed to increase their safety
> during an emergency.

Emergency Operations Plan 2020-2021 at p. 49 (emphasis added).

102.  <u>Testing of Preparedness:</u> Stanislaus has no information online about testing of

emergency planning for persons with disabilities.

103.  <u>Notification:</u> The "2021-2022 Housing Administrative Policies and Regulations

Including COVID-19 Updates" policies do not specify instructions for disabled students about

how to self-identity or give any indication how to participate in emergency preparedness

programs. On information and belief, the evacuation instructions posted on the back of dorm

room doors do not give instructions for persons with disabilities.

104.  There is no information online about how a disabled person can self-identify, who

to tell, whether this information is held confidentially and how, or what steps the campus takes to

ensure disabled persons are included in emergency preparedness programs.

105.  <u>Evacuation Options:</u> Campus policies state this campus has evacuation chairs.

**<u>Fresno</u>**

106.  <u>Preparedness Planning:</u> Fresno apparently requires disabled persons to develop

their own emergency plan either before or even during an emergency, asking unidentified others

to assist them:

> **Persons with Disabilities**
> To ensure you can get help should an emergency occur, prepare by informing your
> supervisor, instructor or safety coordinator if you expect to have difficulty in the event of
> an evacuation.
> ***When reaching an obstruction such as a staircase, request assistance from others in***
> ***the area.***
> - If assistance is not immediately available, stay near the wall in the exit
>   corridor, in the designated stairwell, or on the designated landing.

24

- Continue to call for help until rescued.

If you anticipate not being able to speak loudly, carry a whistle or have other means of attracting the attention of others.

Available at https://adminfinance.fresnostate.edu/emergency/index.html.

107.    The student handbook does not mention persons with disabilities. Available at https://cge.fresnostate.edu/aei/documents/Student%20Handbook%202018.pdf

108.    <u>Testing of Preparedness:</u> Fresno has no information online about testing of emergency planning for persons with disabilities.

109.    <u>Notification:</u> Fresno has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

110.    <u>Evacuation Options:</u> Fresno has no information online about evacuation chairs, two-way communication at rescue areas, or signage designating rescue areas. On information and belief, none of these are available. No areas of rescue are designated on emergency evacuation planning documents.

**<u>Monterey Bay</u>**

111.    <u>Preparedness Planning</u>: Monterey has hired a technical specialist for specifically addressing the needs of persons with disabilities in an emergency. Emergency Operations Plan at p. 6. However, the student handbook does not mention how disabled students can self-identify for emergency preparedness services, or what to do in an emergency. Student Handbooks available at  https://csumb.edu/media/csumb/section-editors/eeip/Student-handbook-AY21_22.pdf. For dormitories, the campus relies on the roommates of individuals with disabilities to assist in evacuating them. Main Campus Evacuation Plan available at https://csumb.edu/housing/past-pages/main-campus-evacuation-plans/.

112.    <u>Testing of Preparedness</u>: Monterey Bay has no documents online about testing of emergency planning for persons with disabilities.

113.    <u>Notification</u>: Monterey Bay has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or

what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

114.   <u>Evacuation Options</u>: Monterey Bay has no information online about evacuation chairs, two-way communication at rescue areas, or signage designating rescue areas. On information and belief, none of these are available. No areas of rescue are designated on emergency evacuation planning documents.

**<u>Bakersfield</u>**

115.   <u>Preparedness Planning</u>: Bakersfield states it takes into consideration the needs of disabled persons. Emergency evacuations are conducted with the help of Building Marshals who, "will be required to report on whether any staff are missing or are known to have remained in the building due to disability or injury" and "[a]ssist people with disabilities in exiting the building." Emergency Response Guide for Students and Faculty p. 14.

116.   <u>Testing of Preparedness</u>: Bakersfield has no information online about testing of emergency planning for persons with disabilities.

117.   <u>Notification</u>: Bakersfield has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

118.   <u>Evacuation Options</u>: Bakersfield has no information online about evacuation chairs, two-way communication at rescue areas, or signage designating rescue areas. On information and belief, none of these are available. No areas of rescue are designated on emergency evacuation planning documents.

**<u>Cal Poly San Luis Obispo</u>**

119.   <u>Preparedness Planning</u>: Cal Poly admits its planning is insufficient for persons with disabilities, "Additional planning, resources, and assistance will be needed to support people with disabilities and others with access and functional needs." Emergency Operations Plan 2018 at p. 5. The campus delegates responsibility for emergency planning for persons with disabilities to the Disabled Student Resources center, "During an emergency, DRC is responsible

26

for the Disabilities Integration Advisor function in the Emergency Operations Center." *Id.* at 37.

120. The Emergency Operations Plan emphasizes that:

> The public's response to any emergency is based on their understanding of the nature of the emergency, the potential hazards, the likely response of emergency services, and ***knowledge of what individuals and groups with or without access and functional needs should do to increase their chances of survival and recovery***. ***DEM will make emergency preparedness information*** from local, State, and Federal sources ***available to all members of the community through presentations, trainings, social media, individual meetings, and their website, emergency.calpoly.edu***.

*Id*. at 32 (emphases added).

121. Even as it admits it is essential for survival and recovery, the campus does not provide any meaningful information for persons with disabilities on its website, www.emergency.calpoly.edu. This includes not providing any information to persons with disabilities in its emergency reference guide, available at https://afd.calpoly.edu/emergency/docs/emergencyreferenceguide.pdf.  It places the burden of developing emergency plans on disabled individuals:

> It is suggested that individuals with permanent disabilities should prepare for emergencies ahead of time by instructing a classmate, instructor, or fellow staff member on how to assist them in case of emergencies.

Evacuation and Sheltering available at https://afd.calpoly.edu/emergency/preparedness/know-what-to-do/evacuation-sheltering.

122. <u>Testing of Preparedness:</u> Cal Poly San Luis Obispo has no information online about testing of emergency planning for persons with disabilities.

123. <u>Notification:</u> Cal Poly San Luis Obispo has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

124. <u>Evacuation Options:</u> Cal Poly San Luis Obispo has no information online about evacuation chairs, two-way communication at rescue areas, or signage designating rescue areas. On information and belief, none of these are available. No areas of rescue are designated on

27

emergency evacuation planning documents.

**San Bernardino**

125. <u>Preparedness Planning:</u> San Bernardino uses a system of building and floor marshals for evacuating persons with disabilities. The campus accessibility guide includes emergency evacuation information:

> Consult with any individual who may have difficulty exiting a building. Determine if the individual has a buddy system in place. Ask the individual if s/he will be able to exit the building without assistance (e.g., a wheelchair user in a classroom on an upper floor of a building) and if not, how to best assist BEFORE making a rescue attempt.

Campus Accessibility Guide at 29 available at https://www.csusb.edu/sites/default/files/2021-11/Campus%20Accessibilty%20Guide_0.pdf. However, there is no information about how or where to be connected with a "buddy," and the policy still leaves planning to the disabled person, "Individuals who have difficulty opening doors or encounter obstructed pathways should ask their buddy or other individual(s) around them for assistance or call 9-1-1 from a telephone for assistance." *Id*. at p. 31.

126. <u>Testing of Preparedness:</u> San Bernardino has no information online about testing of emergency planning for persons with disabilities.

127. <u>Notifications:</u> San Bernardino has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs. The Campus Accessibility Guide does not specify how to be paired with a "buddy."

128. <u>Evacuation Options:</u> San Bernardino appears to have areas of refuge with evacuation chairs.

**Northridge**

129. <u>Preparedness Planning:</u> Northridge uses a Building Marshals plan to evacuate persons with mobility disabilities based on a Department Emergency Action Plan. No planning is required in advance from the plans, but during the emergency, Marshals are to "[a]sk the person what assistance they need." Although apparently not required beforehand, "it is recommended to have this conversation in advance of an emergency and develop a personal evacuation plan for

28

that individual." Department Emergency Action Plan template at p. 15 available at
https://www.csun.edu/sites/default/files/emergency_action_plan.pdf. This policy places the
burden of developing an evacuation plan on persons with mobility disabilities.

130. <u>Testing of Preparedness</u>: Northridge has no information online about testing of
emergency planning for persons with disabilities.

131. <u>Notifications:</u> Northridge has no information online about how a disabled person
can self-identify, who to tell, whether this information is held confidentially and how, or what
steps the campus takes to ensure disabled persons are included in emergency preparedness
programs.

132. <u>Evacuation Options</u>: <u>Northridge</u> has no information online about evacuation
chairs, two-way communication at rescue areas, or signage designating rescue areas. On
information and belief, none of these are available. No areas of rescue are designated on
emergency evacuation planning documents.

**Cal Poly Pomona**

133. <u>Preparedness Planning</u>: Campus police put the burden of emergency preparedness
on disabled persons, stating disabled persons should "know how to help others help you" and
that it is their "responsibility to prepare for emergencies." "Emergency Procedures" at p. 14
available at https://www.cpp.edu/em/files/emergency-procedures-pamphlet.pdf. Cal Poly
Pomona's Emergency Plan Summary states that "If you are disabled" that you should Introduce
yourself to emergency personnel in your building. Work with them to develop and emergency
plan for evacuation." Emergency Plan Summary, 2019 at p. 18. There are no policies or
procedures for providing opportunities to facilitate introductions, or how a disabled persons can
find emergency personnel.

134. <u>Testing of Preparedness:</u> According to its own newspaper, the campus student
services building had never tested its emergency preparedness until April 3, 2019.
https://polycentric.cpp.edu/2019/03/ssb-evacuation-drill-scheduled-over-spring-break/. While
evacuation chairs were available, there was no indication of who would assist disabled persons.
*Id*. There is no information that the campus has engaged in similar drills since.

29

135.  <u>Notifications:</u> Cal Poly Pomona's Disability Resource Center webpage says nothing about emergency preparedness. Cal Poly Pomona has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

136.  <u>Evacuation Options:</u> According to office of emergency management, the campus has 21 evacuation chairs, one for each "each multi-story building on campus."

**Channel Islands**

137.  <u>Preparedness Planning:</u> The Emergency Management Plan is devoid of much information on how to prepare disabled students for emergencies and states simply that when evacuation occurs, "Assist disabled students in exiting the structure. Refer to the section of 'Disabled Consideration' for more details." CSUCI Emergency Management Plan at p. 7. The "Disabled Consideration" addendum merely warns of the potential dangers to disabled persons when assisting them and instructs the emergency aid to ask the disabled person how they wish to be evacuated. While the request of how to help is itself not problematic, the fact that the stated policy is to ask this during the emergency, rather than preparing for it ahead of time, is a problem.

138.  The "do it yourself" emergency preparedness position is echoed in the residential hall policies where "It is suggested that persons with disabilities prepare for emergencies ahead of time:"

   • Learn locations of exit stairways and Areas of Rescue and plan an escape route.
   • Use a buddy system by showing a classmate or instructor how to assist in case of emergency.
   • Persons who cannot speak loudly should carry a whistle or have some means for attracting attention.
   • Plan for emergencies with an RA.

"CSUCI Building Evacuation Procedures September 2020" at p. 2, available at https://www.csuci.edu/publicsafety/emergency-management/evacuationprotocolsep2020.pdf. The campus provides no indication of how this "buddy" system will be implemented, or why it is the disabled student's responsibility—not the university's responsibility—to plan for

30

emergencies.

139. <u>Testing of Preparedness:</u> There can be no adequate or meaningful testing so long as the preferences and requirements for evacuating disabled persons are being negotiated during the drill or the emergency. When seconds count in an emergency it is not the time to discuss how the disabled person wants to be treated. That planning should occur beforehand.

140. <u>Notification:</u> The Disability Accommodations and Support Services page says nothing about emergency preparedness. There is no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

141. <u>Evacuation Options:</u> Channel Islands has no information online about evacuation chairs, two-way communication at rescue areas, or signage designating rescue areas. On information and belief, none of these are available.

**Los Angeles**

142. <u>Disabled Population:</u> As of 2015-2016 there were 250 disabled persons on campus on a regular basis, but it was unknown how many there were during "peak" times. Multi-Hazard Operations Plan at p. 6.

143. <u>Preparedness Planning:</u> Emergency personnel are directed to "6.3.2. Assist in the evacuation of disabled individuals, as needed" and "Coordinate with the Office of Students with Disabilities (OSD) for an accounting of disabled students and staff by location who may require assistance during evacuation." *Id.* p. 4. The planning includes use of evacuation chairs. *Id.* "Office for Students with Disabilities will provide a list of disabled individuals by location to the Director of Public Safety." *Id.*

144. These policies appear to be in response to poor prior emergency management by the campus as the student newspaper reported after an earthquake in 2015:

> Once students were outside, it seemed as if there were no clearly marked evacuation zones, making it difficult for both Emergency Medical Services (EMS) and faculty to navigate. Also, it created no accountability with rosters as students freely dispersed from their professors.

> This should be alarming, as with the shortage of evacuation opportunities for disabled persons and lack of evacuation chairs, for instance, would create a hazard for those dependent on alternate means of mobility within a building like King Hall.

"Earthquake Safety: A Point of Concern" available at

https://csulauniversitytimes.com/earthquake-safety-a-point-of-concern/

145. <u>Testing of Preparedness:</u> Los Angeles has no information online about testing of emergency planning for persons with disabilities.

146. <u>Notifications:</u> The Office for Students with Disabilities Website says nothing about emergency planning. Los Angeles has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

147. <u>Evacuation Options:</u> Los Angeles' website provides the location of all evacuation chairs on campus.

**Fullerton**

148. <u>Preparedness Planning:</u> Fullerton has almost no mention of disabled persons in their Emergency Operations Plan besides, "Inclusion of persons with access and functional needs whenever possible" in preparedness training. Emergency Operation Plan 2017 at p. 24. Each facility appears to be required to have its own plans, however, and the campus requires gather voluntary lists of persons with disabilities and to interview them as to how best to evacuate persons with disabilities. *Id*. at 33.

149. <u>Testing of Preparedness:</u> Fullerton has no information online about testing of emergency planning for persons with disabilities.

150. <u>Notification:</u> The student disability services webpage says nothing about emergency planning. Fullerton has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

151. <u>Evacuation Options: Fullerton</u> has no information online about evacuation chairs,

32

two-way communication at rescue areas, or signage designating rescue areas. On information and belief, none of these are available. No areas of rescue are designated on emergency evacuation planning documents.

**Dominguez Hills**

152. Preparedness Planning: The campus dorms use an emergency warden system to address emergencies. Unfortunately, the campus puts the responsibility for establishing contact and emergency planning on students with disabilities, "In order to receive assistance, occupants who have access and functional needs during an evacuation should request assistance from their Floor Warden, so that advance arrangements can be made to meet their needs." Warden Guide p. 15-16.

153. In an Annual Fire Safety Report from 2021, the report mentions almost nothing about persons with disabilities other than, "Residents with disabilities or those who are unable to wake up to sounding alarms should notify University Housing staff in advance for any special assistance needs." Again, the burden is placed on disabled persons to seek out emergency planning services.

154. Testing Preparedness: Dominguez Hills has no information online about testing of emergency planning for persons with disabilities.

155. Notifications: The Student Disabilities Resource Center website has no information regarding emergency preparedness. Dominguez Hills no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

156. Evacuation Options: Dominguez Hills appears to offer evacuation chairs.

**Long Beach**

157. Preparedness Planning: Long Beach does not have housing policies or handbooks online that mention emergency planning for residents with disabilities. Generally, the campus places the burden for developing an emergency plan on disabled persons by requiring them to "[e]stablish a buddy system and alternate for each class. People with disabilities should prepare

33

for an emergency ahead of time by instructing a classmate, instructor, supervisor, or co-worker on how to assist in the event of any emergency." Emergency Operations Plan 2020-2021 at p. 338 of pdf.

158. <u>Testing Preparedness:</u> Long Beach has no information online about testing of emergency planning for persons with disabilities.

159. <u>Notification:</u> The Disabilities Resource Center (aka Bob Murphy Access Center) website has no information regarding emergency preparedness. Long Beach has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

160. <u>Evacuation Options:</u> Long Beach has emergency chairs.

**<u>San Marcos</u>**

161. <u>Preparedness Planning:</u> Like several other campuses, San Marcos places the burden for developing an emergency plan on disabled persons by requiring them to "[e]stablish a buddy system and alternate for each class. People with disabilities should prepare for an emergency ahead of time by instructing a classmate, instructor, supervisor, or co-worker on how to assist in the event of any emergency." Emergency Management website available at https://www.csusm.edu/em/procedures/standard.html. There is confusing policy language that appears to indicate that university personnel should ensure a buddy system exists in the middle of an emergency, "Check on people with special needs during an evacuation, determine if they have established a "buddy system," and ensure their safe evacuation." *Id.*

162. The Residence Handbook has information regarding emergencies including emergency preparedness plan. However, it is silent as to persons with disabilities.

163. <u>Testing of Preparedness</u> San Marcos has no information online about testing of emergency planning for persons with disabilities.

164. <u>Notification:</u> The Student Disabilities Services website has no information regarding emergency preparedness. San Marcos has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or

34

what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

165.    Evacuation Options: San Marcos has evacuation chairs.

**San Diego**

166.    Preparedness Planning: The Emergency Operations Plan is not public document online. You must have a log-in credential to access it. San Diego's website has a synopsis of the plan, but it simply concludes that the plan complies with the law—it does not specify what its policies are with regard to persons with disabilities otherwise or how they are implemented.

167.    Testing of Preparedness: San Diego has no information online about testing of emergency planning for persons with disabilities.

168.    Notification: The Student Disabilities Services website has no information regarding emergency preparedness. The Emergency Operations Plan is not available to the public. San Diego has no information online about how a disabled person can self-identify, who to tell, whether this information is held confidentially and how, or what steps the campus takes to ensure disabled persons are included in emergency preparedness programs.

169.    Evacuation Options: San Diego has no information online about evacuation chairs, two-way communication at rescue areas, or signage designating rescue areas. On information and belief, none of these are available. No areas of rescue are designated on emergency evacuation planning documents.

**Additional Physical and Policy Barrers at Humboldt**

170.    **Parking at Del Norte Residence Hall**: Plaintiff brought her car with her to Humboldt. She has a permit to park her car in the lot closest to Del Norte, on the corner of Harpst Street and L.K. Wood Boulevard. Plaintiff's car has disabled license plates issued to her by the State of California, which entitle her to park in designated accessible parking places. However, there are no designated accessible parking places in the lot nearest to her residence hall. Therefore, Plaintiff must park in whatever standard parking space is available when she arrives in the parking lot.

171.    The lack of designated accessible parking near the entrance to Del Norte has

35

created significant difficulty for Plaintiff. When Plaintiff uses her car, she does not take her power wheelchair with her because she does not own a vehicle which the wheelchair can fit into. Therefore, Plaintiff must walk to and from her car when she uses it. Although Plaintiff can walk short distances when she is feeling well, she has great difficulty walking longer distances. It is therefore imperative that she be allowed to park in a designated accessible parking space which is close to the entrance of her residence hall on an accessible path of travel as required by law. There are many days when she cannot use her car because she is physically unable to walk to the far parking space that the car is parked in.

172. **Del Norte Residence Hall Laundry Room**: Plaintiff is unable to independently access the laundry room in the Del Norte Residence Hall. The door to the laundry room is excessively heavy. Unless there is another person there to assist her in opening the door or if the door is propped open, Plaintiff is unable to enter and exit the laundry room. Additionally, the washing machines are too low for her to reach from her wheelchair. Plaintiff has been forced to do her laundry at the Emerald City Laundromat in Arcata, California, instead of in her own residence hall.

173. On August 25, 2021, Plaintiff sent an email to Todd Larsen requesting that the door be adjusted so that she could at least enter and exit the laundry room in Del Norte independently. Mr. Larsen put Plaintiff in touch with Travis Fleming from facilities, and they met to discuss the access issues in the laundry room. However, the door remains too heavy for Plaintiff to open independently, and although the idea is for the door to remain propped open with a doorstop, it is often closed and thus inaccessible to Plaintiff.

174. **Jolly Giant Commons:** At the beginning of the term, Plaintiff bought a meal plan from Defendant Compass for $2,800 so that she could eat her meals in the dining hall, Jolly Giant Commons. However, each time she uses the dining hall, she encounters barriers that prevent her from full and equal access to the service provided there.

175. Despite Defendants' assurances that the entrance to Jolly Giant Commons is "code compliant," in practice, due to the policies in place by Defendants the entrance is not accessible to Plaintiff. There are two side-by-side entrances to the Jolly Giant Commons. The

36

main entrance is a revolving door that is not accessible to Plaintiff. Then there is a set of double glass exit doors next to the entrance which has been ostensibly designated as the "accessible" entrance. One of those glass doors has been equipped with an automatic door opener, however, the door opener is not operable because Defendants place a door stopper under it, as described in more detail below. Plaintiff is unable to open the heavy glass doors independently without the use of the automatic door opener which in turn is not operable.

176. Plaintiff has encountered two main issues with the accessibility of the designated accessible entrance. First, to maintain orderly procession of students using the cafeteria, Defendants want all of the students to use the revolving door to enter and exit the facility. They often only unlock that set of doors, not the automatic doors. This leaves Plaintiff left outside until she can either flag down an employee to open the door or ask a passing student to enter the building and request that the staff open the accessible door for Plaintiff. Both of these efforts cause Plaintiff discomfort and embarrassment from the unwanted attention and the highlighting of her inability to open the door by herself. Defendants have not instituted a policy that when the doors to the dining hall are unlocked, both the main and the accessible entrances will be unlocked.

177. The second issue occurs when Defendants' employees prop the accessible entrance open with a door stop, which happens almost daily. When Defendants' employees prop the door open with a door stopper it often prevents the activated automatic door from opening fully opening the door. Plaintiff cannot use the door in a partially open position. When this happens, Plaintiff must wait for someone to assist her in opening the door because the automatic door opener does not have enough power to swing the door open if the door is propped open part way and stuck on the doorstop.

178. Once, when the door was half-propped open in this manner, Plaintiff's wheelchair bumped the doorstop as she entered the building, the door slammed shut on her arm, causing a physical personal injury and a bruise. To rectify this barrier, Defendants must create a policy of not propping open the door at all or only propping open the door that does not have the automatic door opener.

37

179. Once Plaintiff has entered the Jolly Giant Commons, there is no accessible path of travel that allows her to retrieve her food and get to a dining table. The tables and chairs in the dining room are set up in such a way that does not create a path wide enough for Plaintiff to fit through in her wheelchair. She must constantly ask other students to move their chairs so that she can fit through to access the food stations and the dining tables.

180. Many of the food stations are also inaccessible to Plaintiff because she is unable to reach them from her wheelchair, including the fountain drink dispenser, the cereal bar, and the alternative milk refrigerator. Additionally, the way the food stations are set up forces Plaintiff to block seating or other food stations when she is waiting in line. There simply is not enough space between the food stations, table, and chairs, for her wheelchair to fit comfortably. Plaintiff always feels like she is in the way and is embarrassed.

181. Defendants have also failed to provide adequate accessible seating throughout the dining room because the tables do not offer adequate knee and leg space. The only usable seating available to Plaintiff is for her to pull her wheelchair under a table at the end of a booth. When she does this, her wheelchair sticks out into the path of travel of other students. Additionally, she has to sit in such a way that blocks the bench seating for other students. This makes it very difficult for her to eat with other students as they cannot access the seating at the table. Further, it isolates and segregates Plaintiff, as she must sit facing the wall, unable to make eye contact or greet other students to ask them to sit with her. Plaintiff needs accessible seating at tables that will allow her to sit with other students in an integrated setting and not block all the seating at the table.

182. Plaintiff is also immunocompromised as a result of the rheumatoid arthritis, so she is unable to eat food left out on a buffet. She has requested and received the accommodation of being allowed to request that food, such as fresh fruits and vegetables, be brought to her straight from the kitchen instead of her serving herself from the buffet. However, Defendants' employees have not been trained to accommodate Plaintiff, and they often refuse to accommodate her or are rude to her when she makes such requests.

183. The dining hall has a door that leads to a stairwell which then descends to a door

that exits to the building's exterior. There is no signage indicating whether this exit route is accessible to wheelchair users. Further, upon opening the first door at the top of the stairwell, the door locks, prohibiting reentrance into the dining hall. On August 18, 2021, Plaintiff tried to exit the dining hall through this exit route believing that it would be accessible. Once she entered the stairwell and realized that she had no ability to navigate to the bottom, Plaintiff tried to reenter the dining hall only to realize that she was trapped because the door was locked. Plaintiff had to knock on the door and wait for someone to hear her knock and let her back into the dining hall. Luckily, someone was leaving the dining hall through this exit route and opened the door, allowing Plaintiff to reenter the dining facility.

184. Plaintiff has brought the above-referenced barriers to access to the attention of Defendants many times prior to the filing of this Amended Complaint. Finally on September 21, 2021, Plaintiff met with Roger Y. Wang, Associate Dean of Students, to discuss the access issues she was experiencing at the dining hall. After their conversation (six weeks after the term started), Defendants did a limited audit of the dining hall to identify some of the barriers to access. They provided some limited fixes as moving the cereal bar, and they promised to provide other fixes such as, providing a rubber slip resistant doorstop for the front entrance, moving tables and chairs to make an accessible path of travel, and ordering new accessible tables. However, none of those proposed remedies have materialized.

185. Plaintiff has a service dog named "Lucky." Lucky has been trained to perform various tasks to assist Plaintiff because of her disabilities. Plaintiff frequently visited the dining hall with her service dog without any incident. Then, on or about September 1, 2021, Plaintiff, while with her service dog, was confronted by "Sydney," the dining hall manager. Sydney told Plaintiff: "That dog is not allowed." In response, Plaintiff explicitly told the manager that Lucky is a service animal. Sydney still demanded that Plaintiff leave the dining hall. Plaintiff left feeling shocked and upset.

186. Further, Dean Wang also informed Plaintiff that there were reports that she was feeding her service dog in the dining hall. Plaintiff vehemently denies that she ever has or would feed her service dog in a dining facility, and these statements, on information and belief, were

39

made by Defendants' employees in retaliation of Plaintiff standing up for her right to have full and equal access to the dining facilities at Humboldt.

187.     Since Plaintiff brought the above referenced barrier to access to the attention of Defendants, Humboldt has informed her that they will provide her with a "buddy" to go to the dining hall with her to assist Plaintiff in accessing the facilities. However, Plaintiff does not want the paternalistic option of being accompanied by a "buddy" to access the dining facility on campus. She wants to be able to access Defendants' services on her own whenever she wants just like any other students, just as she paid for. Plaintiff is a busy student, and she does not have time to schedule every meal with a "buddy." This plan would also result in Plaintiff being denied meals when the "buddy" is delayed, sick, unavailable, etc.

188.     Plaintiff has either encountered barriers at Jolly Giant Commons or been deterred from eating at the dining hall in order to avoid those barriers to access every day since she started eating her meals there on August 16, 2021. Despite her many complaints to Defendants, the dining hall remains inaccessible to her.

189.     Furthermore, The Jolly Giant Commons have no evacuation plan and no evacuation equipment for persons with disabilities.

190.     Due to the continuing Covid-19 pandemic, campus activities are extremely limited, and most buildings are not open for student use. The dining hall is one of the only areas on campus where Plaintiff can go to socialize with other students and take a break from studying in her room. The barriers that Defendants have created and maintained in the dining hall have isolated Plaintiff from the social aspect of college. She feels ostracized by the other students, especially those who work in the dining hall, because her complaints about disabled access have been publicized to them. Plaintiff feels that the other students now see her as a "problem" instead of peer who they want to be friends with. Had the dining hall been accessible to Plaintiff from the beginning, she would not have had to feel isolated from the rest of the student body.

191.     **University Sponsored Student Life Activities:** Humboldt periodically hosts events for either the student or a certain subset of students on campus. As the ResLife & You Handbook states, "Our Residence Life Staff plan various activities throughout the year to build

40

strong community, and we strive to make our events accessible to all residents. Residents who wish to request disability related accommodations for events, including sign language interpreters, should contact Residence Life at ResLife@Humboldt.edu." Handbook at p. 4. However, many of the activities that Plaintiff has been invited to as a transfer student and a resident of Del Norte residence hall have been inaccessible to her.

192. At the beginning of the school year, Housing & Residence Life organized a hike specifically geared to towards students that had transferred to Humboldt State University from other institutions. The hike was scheduled for August 20, 2021. On August 16, 2021, Plaintiff emailed Lake Luther, the Residence Life Coordinator for College Creek, and asked if the hike would be wheelchair accessible. On August 17, 2021, Ms. Lake emailed Plaintiff that the hike was not wheelchair accessible. Plaintiff requested that Ms. Lake provide accessibility information on the flyer in the future. She also expressed her disappointment that the activity would not be accessible.

193. On August 19, 2021, Plaintiff received an email reminding her of the Transfer Hike on August 20th. There was a note on the flyer stating that "if you need accommodations, please contact us immediately." Plaintiff responded with an email asking why the hike was not accessible to students with disabilities. She did not receive a response. Plaintiff wanted to participate in the event as it was one of the only in-person events to give transfer students a chance to meet each other. She is also aware that there are many hikes around campus that are on accessible paths of travel, so there is no reason that the hike could not have been moved to an accessible path when she expressed her interest in participating five days prior to the date of the hike.

194. A second hike was also planned for Del Norte residents on October 22, 2021. Again, the hike was planned for an inaccessible path for Plaintiff. She was extremely disappointed that she was excluded from participation in another resident activity due to Humboldt's failure to provide accessibility. Plaintiff would like to build relationships with other residents of Del Norte, but Humboldt makes it extremely difficult for her to do so by excluding her from activities which allow residents to meet each other in person. Humboldt has sent the

41

message to Plaintiff that she is a burden and not wanted at Humboldt State University because she is a person with a disability who uses a wheelchair for ambulation.

195.    Plaintiff was looking forward to having the experience of living on campus with a community of friends during her final year of college. Plaintiff came up from Oakland in part to be in nature and she cannot do that because the events are not accessible. She was looking forward to a "normal" experience after the last 18 months of online, impersonal education. However, Defendants have made her experience extremely stressful instead of rewarding. They have isolated her instead of including her. Plaintiff already felt different than the other students when she arrived on campus, and Defendants have only alienated her further by forcing her to beg for every inch of accessibility on campus. The campus and dining hall should have been accessible to Plaintiff when she arrived. Plaintiff should not have to notify Defendants of the barriers to access they created and then beg them repeatedly to fix those barriers, only to have Defendants fail to remedy the barriers.

196.    **Forestry Building Restrooms and Signage:** On October 17, 2021, Plaintiff received her schedule for the next semester classes. Several of the classes were available virtually, but one class meets only in person. This class was located in Forestry Building Room 201 on the second floor. Concerned that there would be physical accessibility issues for the class given her previous experiences on campus, Plaintiff visited the building.

197.    Plaintiff attempted to locate an accessible route to the entrance, but there were no signs indicating where she should go as wheelchairs user. She found one entrance, but the glass door was too heavy to open. It also was missing a kick-plate and Plaintiff worried about shattering the door if she bumped it. A passerby offered to assist her, which was embarrassing because Plaintiff prides herself on her independence. Upon opening the door for her, however, the stranger said there were only stairs down the hall and no way to the second floor. Another entrance on the other side of the building, the stranger said, was accessible.

198.    Plaintiff went to the other entrance and was able to enter the building. Plaintiff looked for a restroom and was able to locate one on the first floor. The door handle was excessively high, and she had to strain to open the door. Upon entering, Plaintiff found no

42

accessible stall for wheelchair users. Instead, there was a semi-ambulatory stall that lacked turn-around space, and Plaintiff could not use, as depicted below:



199.    On information and belief, other restrooms throughout the campus are not accessible for similar reasons.

200.    **Entrance/Exit Doors at Recreation Center, Laundry Room, and Art Building:** Plaintiff had difficulty accessing the recreation center building because its exterior door was excessively heavy. Plaintiff complained in February 2022 regarding the inaccessible door, but her concerns were not addressed.

201.    Plaintiff has also had difficulty accessing the laundry room because the laundry room's exterior door is too heavy for Plaintiff to operate. Plaintiff also complained about this inaccessible door in the fall of 2021, but Plaintiff's concerns have yet to be addressed.

202.    Likewise, the interior classroom door in the Art Building is inaccessible to Plaintiff because it is excessively heavy. Despite complaining, the door remains excessively heavy.

43

203.    Plaintiff worries about the doors being too heavy for her to use throughout the entire campus, and as a result, Plaintiff is deterred from exploring the campus.

204.    **Path of Travel from the Dorm Building:** Around ten times, including as recently as on February 16, 2022, a garbage truck has blocked Plaintiff's path of travel from her dorm. As a result, Plaintiff was late to a meeting on February 16, 2022.

205.    These barriers to access are listed without prejudice to Plaintiff citing additional barriers to access by an amended complaint after inspection by Plaintiff's access consultant(s)/expert(s). All of these barriers to access render the premises inaccessible to physically disabled persons who are mobility impaired, such as Plaintiff, and are barriers Plaintiff may encounter while she finishes her degree at the premises and if she returns to the campus after she completes her degree to visit or for graduate school, which she expects and intends to do once proper disabled access is provided. All facilities must be brought into compliance with all applicable federal and state code requirements, according to proof.

### FIRST CAUSE OF ACTION:
### VIOLATION OF TITLE II OF THE ADA
### [42 U.S.C. §§ 12101, *et seq.*]
### *(On behalf of Plaintiff and Proposed Classes against Defendant Trustees)*

206.    Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Amended Complaint and incorporates them herein by reference as if separately repled.

207.    At all times herein mentioned, Plaintiff was entitled to the protections of the "Public Services" provisions of Title II of the ADA, Subpart A, which prohibits discrimination by any public entity as defined by 42 U.S.C. section 12131. Plaintiff was at all times relevant herein a qualified individual with a disability for all purposes under the ADA.

208.    In violation of Title II of the ADA, the Trustees have failed to ensure that individuals with physical disabilities such as the Plaintiff herein are not excluded from "services, programs and activities" at the subject facilities and property. By reason of the Trustees' failure to remove architectural and policy barriers to access at the subject facilities (including without

44

limitation, the failure to ensure CSU campuses have appropriate emergency plans and to include mobility disabled students in campus life activities available to non-disabled students) so as to render them "accessible to and useable by" mobility impaired persons, despite actual notice of the inaccessible conditions, and by its policy decisions as above-described including actions and omissions by any predecessors in interest, the Trustees have discriminated against Plaintiff in violation of Title II of the ADA and the regulations adopted to implement the ADA.

209.     Plaintiff's experiences at Humboldt, with its lack of emergency policies, planning and preparedness, are typical of a systemic failure to comply with the ADA requirements for emergency planning for persons with disabilities, "when viewed in their entirety."

210.     With relation to damages claimed under Title II of the ADA, each such instance of discrimination is alleged to have been intentional and/or has been created and maintained with deliberate indifference to the effect upon Plaintiff and other similarly disabled persons.

211.     As a result of such intentional discrimination, in violation of section 12132 of the ADA, Plaintiff is entitled to the remedies, procedures and rights set forth in section 505 of the Rehabilitation Act of 1973 (29 U.S.C. § 794a), as provided by section 12133 of the ADA. All such acts and omissions by the Trustees were also part of a joint venture and common enterprises with the Compass in this action.

### SECOND CAUSE OF ACTION:
### VIOLATION OF TITLE III OF THE ADA
### [42 U.S.C. §§ 12101, *et seq.*]
### *(On behalf of Plaintiff Against Defendant Compass)*

212.     Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Amended Complaint and incorporates them herein as if separately repled.

213.     Plaintiff was at all times relevant herein a qualified individual with a disability for all purposes under the ADA.

214.     Plaintiff has reasonable grounds for believing she will be subjected to discrimination each time she may attempt to use the subject property and premises or attempt to patronize the dining hall at Humboldt, considering Compass' policies and physical premises

45

barriers.

215.    The subject property and facility operated by Compass is one of the "private entities" which are considered "public accommodations" for purposes of Title III of the ADA, which includes any "restaurant, bar, or other establishment service food or drink" (42 U.S.C. § 12181(7)(B)).

216.    The acts and omissions of Compass set forth herein were in violation of Plaintiff's rights under the ADA and the regulations promulgated thereunder, 28 C.F.R. Part 36 *et seq*.

217.    The removal of each of the physical and policy barriers complained of by Plaintiff as hereinabove alleged, were at all times herein mentioned "readily achievable" under the standards of sections 12181 and 12182 of the ADA. As noted throughout this Amended Complaint, removal of each and every one of the architectural and/or policy barriers complained of herein were already required under California law.

218.    On information and belief, dining hall and the subject areas of Humboldt under Compass' control were modified after January 26, 1993. Any alterations, structural repairs, or additions since January 26, 1993, have independently triggered requirements for removal of barriers to access for disabled persons per section 12183 of the ADA.

219.    The ability to enter and exit the dining facility, move around the premises unimpeded by architectural barriers, serve oneself food, and sit at a table to eat is a fundamental necessity of accessing and using a dining hall. Therefore, the benefits of creating a fully compliant and accessible wheelchair dining table and entrance and exit to the dining facility do not exceed the costs of readily achievable barrier removal. These costs are fundamental to doing business, like any other essential function of operating a dining hall, such as the costs of as ensuring fire safety. It is thus readily achievable to remove these barriers.

220.    Compass has discriminated against Plaintiff in violation of Title III of the ADA by: (a) providing benefits that are unequal to that afforded to people without disabilities by not providing an accessible entrance, path of travel, and other accessible features; (b) failing to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford (and would not fundamentally alter the nature of) the goods, services,

46

facilities, privileges, advantages, or accommodations to individuals with disabilities; (c) failing to take steps as may be necessary to ensure that no individual with a disability is excluded, denied service, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services; (d) failing to remove architectural barriers that are structural in nature in existing facilities where such removal is readily achievable; and © where Compass can demonstrate the removal of architectural barriers is not readily achievable, failing to make the goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

221. On information and belief, as of the date of Plaintiff's encounters at the premises and as of the filing of this Amended Complaint, Compass' actions, policies, and physical premises have denied and continue to deny full and equal access to Plaintiff and to other mobility disabled persons in other respects, which violate Plaintiff's right to full and equal access and which discriminate against Plaintiff on the basis of her disabilities and, thus wrongfully denying to Plaintiff the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations, in violation of 42 U.S.C. sections 12182 and 12183 of the ADA.

222. Compass' actions continue to deny Plaintiff's rights to full and equal access by deterring Plaintiff from patronizing the dining hall as often as she would like to and has discriminated and continue to discriminate against her on the basis of Plaintiff's disabilities, thus wrongfully denying to Plaintiff the full and equal enjoyment of Compass' goods, services, facilities, privileges, advantages and accommodations, in violation of the ADA. 42 U.S.C. § 12182.

**THIRD CAUSE OF ACTION:**
**VIOLATION OF SECTION 504**
**[29 U.S.C. § 794]**
*(On behalf of Plaintiff and Proposed Classes Against Defendant Trustees)*

223. Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Amended Complaint and incorporates them herein as if separately repled.

224. Plaintiff and the proposed classes are otherwise qualified individuals with disabilities within the meaning of Section 504 in that they have disabilities that substantially

47

limit one or more major life activities, such as walking or standing. *See* 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102); *see also* 28 C.F.R. § 39.103.

225.     Upon information and belief, the Trustees are recipients of federal financial assistance sufficient to invoke the coverage of Section 504. Moreover, the Trustees have received such federal financial assistance at all times relevant to the claims asserted in this Amended Complaint.

226.     The Trustees and their agents and employees have violated, and continue to violate, Section 504 and the regulations promulgated thereunder by excluding Plaintiff and the Proposed Classes from participation in, denying Plaintiff and the Proposed Classes the benefits of, and subjecting Plaintiff and the Proposed Classes to discrimination in access to the CSU's programs based solely by reason of their disability/disabilities.

227.     Under Section 504 and the implementing regulations, the Trustees are obligated to make CSU accessible as a whole to students who have physical disabilities. Yet, Defendants have failed to do so, and their ongoing refusal to do so amounts to discriminatory exclusion of those students from CSU campuses.

228.   As a direct and proximate cause of the aforementioned acts, Plaintiff has been and continues to be injured.

**FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE UNRUH ACT**
**[Cal. Civil Code §§ 51 and 52]**
*(On behalf of Plaintiff Against Defendant Compass)*

229.     Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Amended Complaint and incorporates them herein as if separately repled.

230.     The subject university and dining facilities owned and operated by Compass is a business establishment within the meaning of the Unruh Act. Compass is the owner and operator of a business establishment.

231.     Civil Code section 52 provides that the discrimination by Compass against Plaintiff on the basis of her disability constitute a violation of the general anti-discrimination provision of sections 51 and 52. For purposes of this statute, Compass owned and/or operated the

48

property where the subject university and dining facility was and is operated as a business establishment, including on August 16, 2021, and thereafter.

232. Compass' discrimination constitutes a separate and distinct violation of Civil Code § 52, which provides that:

> Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to section 51, 51.5, or 51.6 is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6.

233. Compass violated the Unruh Act by its acts and omissions, as follows:

A. Failing to construct and/or alter the dining hall and subject areas of Humboldt under Compass' control in compliance with state building code and state architectural requirements;

B. Failing to remove known barriers to access at the dining hall and subject areas of Humboldt under Compass' control;

C. Failing to modify policies and procedures as necessary to ensure Plaintiff full and equal access to the accommodations, advantages, facilities, privileges, and/or services of the dining hall and subject areas of Humboldt under Compass's control; and

D. Violating the ADA, a violation of which is a violation of the Unruh Act. Cal. Civil Code § 51(f).

234. The actions and omissions of Compass as herein alleged constitute a denial of access to and use of the described public facilities by physically disabled persons within the meaning of California Civil Code sections 51 and 52. As a proximate result of Compass' actions and omissions, Compass has discriminated against Plaintiff in violation of Civil Code sections 51 and 52 and are responsible for statutory, compensatory and treble damages to Plaintiff, according to proof.

235. Plaintiff has experienced barriers to access at the dining hall and subject areas of

49

Humboldt under Compass' control, all of which have caused her major difficulty, discomfort and embarrassment. Plaintiff suffered physical, mental and emotional damages, including statutory and compensatory damages.

236. Plaintiff would like to continue to attend Humboldt until she graduates from her undergraduate program and may also want to return to Humboldt for her graduate studies. Plaintiff is continuing to be injured by the lack of access at the dining hall and areas of Humboldt under Compass' control and is deterred from attempting to access these areas as often as she would like, because the lack of access will foreseeably cause her further difficulty, discomfort, and embarrassment. Plaintiff is unable, so long as such acts and omissions of Compass continue, to achieve equal access to and use of these public facilities. Plaintiff has a meal plan and will return to eating at the dining hall for nearly every meal once proper entrances, paths of travel, and seating are provided. However, Plaintiff cannot use the dining hall, its facilities, and areas of Humboldt under Compass' control as often as she wants to and is deterred from full-time patronage until these facilities are made properly accessible for disabled persons, including Plaintiff.

237. Further, on information and belief, the dining hall and subject areas of Humboldt under Compass' control are also illegally inaccessible in multiple other respects. As noted above, the barriers to access described in this Amended Complaint are listed without prejudice to Plaintiff citing additional barriers to access after inspection by Plaintiff's access consultant(s)/expert(s).

238. These barriers to access render the dining hall and subject areas of Humboldt under Compass' control inaccessible to and unusable by persons with mobility disabilities. All facilities must be brought into compliance with all applicable federal and state code requirements. Plaintiff prays for leave to amend this Complaint, if necessary, to obtain full injunctive relief as to those barriers that limit or deny full and equal access to persons with similar mobility disabilities.

239. Each violation of the ADA constitutes a separate and distinct violation of California Civil Code section 51(f), thus independently justifying an award of damages and

50

injunctive relief pursuant to California law, including Civil Code section 52.

240.    With respect to Compass' violations of the Unruh Act that are not predicated on violations of the ADA, Compass' behavior was intentional: it was aware of and/or was made aware of its duties to remove barriers that prevent persons with mobility disabilities like Plaintiff from obtaining full and equal access to the dining hall and subject areas of Humboldt under Compass' control. Compass' discriminatory practices and/or policies that deny full enjoyment of the dining hall and subject areas of Humboldt under Compass' control to persons with physical disabilities indicate actual and implied malice and conscious disregard for the rights of Plaintiff and other similarly disabled individuals. Accordingly, Compass has engaged in willful affirmative misconduct in violating the Unruh Act.

241.    On information and belief, the access features of the dining hall and subject areas of Humboldt under Compass' control have not been improved since Plaintiff's last visit there. Plaintiff's injuries are ongoing so long as Compass does not modify its policies and procedures and provide fully accessible facilities for Plaintiff and other persons with similar mobility disabilities.

242.    At all times herein mentioned, Compass knew, or in the exercise of reasonable diligence should have known, that the barriers, policies, and practices at its facilities violated disabled access requirements and standards and had a discriminatory impact upon Plaintiff and upon other persons with similar mobility disabilities, but Compass failed to rectify the violations, and presently continues a course of conduct in maintaining barriers that discriminate against Plaintiff and similarly-situated disabled persons.

**FIFTH CAUSE OF ACTION:**
**VIOLATION OF CALIFORNIA CIVIL CODE §§ 54 and 54.1, *et seq.*,**
**CALIFORNIA GOVERNMENT CODE §§ 4450, *et seq.*,**
**AND THE ADA AS INCORPORATED BY CIVIL CODE §§ 54(c) and 54.1(d)**
*(On behalf of Plaintiff Against Defendant Compass)*

243.    Plaintiff repleads and incorporates by reference, as if fully set forth hereafter, the allegations contained in all paragraphs of this Amended Complaint and incorporates them herein as if separately repled.

244.    At all times relevant to this Amended Complaint, California Civil Code section

51

54(a) has provided that:

> (a) Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, . . . public facilities and other public places.

Emphasis added.

245. At all times relevant to this Amended Complaint, California Civil Code section 54.1 has provided that physically disabled persons are not to be discriminated against because of physical handicap or disability in the use of a public accommodation:

> . . . [P]hysically disabled persons shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities and privileges of all common carriers, airplanes, motor vehicles. . . or any other public conveyances or modes of transportation, telephone facilities, hotels, lodging places, places of public accommodation, and amusement or resort, and other places to which the general public is invited, subject only to the conditions or limitations established by law, or state or other federal regulations, and applicable alike to all other persons.

The discrimination by Compass against Plaintiff on the basis of her disability constitutes a violation of the general anti-discrimination provision of Civil Code sections 54 and 54.1.

246. Plaintiff is informed and believes and therefore alleges that the specified public facility are structures or related facilities within the meaning of California Government Code sections 4450 and 4451. Plaintiff is further informed and believes and therefore alleges that Compass has constructed, altered, or repaired relevant portions of the subject public property, structure and facilities since November 13, 1968, within the meaning of Government Code sections 4450, *et seq.*, including section 4456, thereby requiring provision of access to persons with disabilities, as required by law. The actions and omissions of Compass as herein alleged constitutes a denial of access to and use of the described public facilities by physically disabled persons within the meaning of Government Code sections 4450, *et seq*. As a proximate result of Compass' action and omissions, said Defendant has discriminated against Plaintiff in violation of Government Code sections 4450, *et seq.*, and of the Title 24-2 regulations adopted to implement sections 4450ff since 1982. Each violation of sections 4450, *et seq.* constitutes a violation of Civil Code sections 54 and 54.1.

247. On information and belief, the access features of the dining hall and subject areas of Humboldt under Compass' control have not been improved since Plaintiff's last visit there.

52

Plaintiff's injuries are ongoing so long as Compass does not modify its policies and procedures and provide fully accessible facilities for Plaintiff and other persons with similar mobility disabilities.

248. At all times herein mentioned, Compass knew, or in the exercise of reasonable diligence should have known, that the barriers, policies, and practices at its facilities violated disabled access requirements and standards and had a discriminatory impact upon Plaintiff and upon other persons with similar mobility disabilities, but Compass failed to rectify the violations, and presently continues a course of conduct in maintaining barriers that discriminate against Plaintiff and similarly-situated disabled persons.

249. The acts and omissions of Compass, complained of herein, continue on a day-to-day basis, and have the effect of wrongfully excluding Plaintiff and other members of the public who are physically disabled, including but not limited to wheelchair users, from full and equal access to these public facilities. Such acts and omissions are the cause of humiliation and mental and emotional suffering of Plaintiff in that these actions continue to treat disabled Plaintiff as inferior and second-class citizens and serve to discriminate against her on the sole basis that she is a person with disabilities who requires the use of a wheelchair for movement in public places.

250. Plaintiff would like to continue to attend Humboldt until she graduates from her undergraduate program and may also want to return to Humboldt for her graduate studies. Plaintiff is continuing to be damaged by the lack of access at the dining hall and areas of Humboldt under Compass' control and is deterred from attempting to access these areas as often as she would like, because the lack of access will foreseeably cause her further difficulty, discomfort and embarrassment. Plaintiff is unable, so long as such acts and omissions of Compass continue, to achieve equal access to and use of these public facilities. Plaintiff has a meal plan and will return to eating at the dining hall for nearly every meal once proper entrances, paths of travel, and seating are provided. However, Plaintiff cannot use the dining hall, its facilities, and areas of Humboldt under Compass' control as often as she wants to and is deterred from full-time patronage until these facilities are made properly accessible for disabled persons, including Plaintiff.

53

251.     As a result of the denial of full and equal access to the described facilities and due to the acts and omissions of Compass in owning, operating, leasing, constructing, altering, and maintaining the subject facilities, Plaintiff has suffered a violation of her civil rights, including but not limited to rights under Civil Code sections 54 and 54.1, and has suffered difficulty, discomfort and embarrassment, and physical, mental and emotional personal injuries, including embarrassment, exhaustion and frustration, all to her damages per Civil Code section 54.3, including general and statutory damages, and treble damages, as hereinafter stated. Compass' actions and omissions to act constitute discrimination against Plaintiff on the basis that she was and is physically disabled and the fact that she is unable, because of the architectural and policy barriers created and/or maintained by Compass, in violation of the subject laws, to use the public facilities on a full and equal basis as other persons. The violations have deterred Plaintiff from returning to attempt to patronize the dining hall as often as she would like and will continue to cause her damages each day this barrier discrimination continues.

252.     Any violation of the ADA also constitutes a violation of sections 54 (c) and 54.1(d) of the California Civil Code, thus independently justifying an award of damages and injunctive relief pursuant to California law. Plaintiff alleges that she has been denied such full and equal access as required by California law which incorporates the ADA, including but not limited to 42 U.S.C. sections 12132, 12133 and 12134, including regulations.

**SIXTH CAUSE OF ACTION:**
**VIOLATION OF CALIFORNIA CIVIL CODE §§ 54 & 54.1,** *et seq.* **and**
**CALIFORNIA HEALTH & SAFETY CODE §§ 19955** *et seq.*
*(On Behalf of Plaintiff Against Defendant Compass)*

253.     Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Amended Complaint and incorporates them herein by reference as if separately repled.

254.     Plaintiff and other similarly situated physically disabled persons, including those who require the use of a wheelchair or other assistive device, are unable to use public facilities on a "full and equal" basis unless each such facility is in compliance with the provisions of California Health & Safety Code sections 19955 - 19959. Plaintiff is a member of that portion of

54

the public whose rights are protected by the provisions of Health & Safety Code §§ 19955-19959, which require the facilities to be made accessible upon construction or alteration. Further, Plaintiff is also protected against policy and architectural barrier discrimination by California Civil Code sections 54 and 54.1.

255.     On information and belief, the provisions of both Health and Safety Code sections 19955 and 19955.5, apply to Humboldt and its dining facilities.

256.     Title 24, California Code of Regulations, formerly known as the California Administrative Code, was in effect at the time of each alteration which, on information and belief, occurred at such public facility since January 1, 1982, thus requiring access complying with the specifications of Title 24 whenever each such "alteration, structural repair or addition" was carried out.

257.     On information and belief, Compass and/or its predecessors in interest carried out new construction and/or alterations, structural repairs, and/or additions to such buildings and facilities during the period Title 24 has been in effect. Further, Plaintiff alleges, on information and belief, that construction, alterations, structural repairs, and/or additions which triggered access requirements at all relevant portions of the dining hall, also occurred between July 1, 1970, and December 31, 1981, and required access pursuant to the A.S.A. Regulations then in effect, pursuant to the incorporated provisions of California Government Code sections 4450 *et seq*. Further, on information and belief, additions and alterations to the building after the initial construction also occurred after July 1, 1970, triggering access requirements per Health and Safety Code section 19959, and as to alterations or additions after January 26, 1993, triggering ADA liability and requirements per 42 U.S.C. sections 12182 and 12183 of the ADA. Compass is liable as a successor in interest for operating a dining hall facility that were operating in violation of Federal and California law.

258.     On information and belief, the access features of the dining hall and subject areas of Humboldt under Compass' control have not been improved since Plaintiff's last visit there. Plaintiff's injuries are ongoing so long as Compass does not modify its policies and procedures and provide fully accessible facilities for Plaintiff and other persons with similar mobility

55

disabilities.

259.    At all times herein mentioned, Compass knew, or in the exercise of reasonable diligence should have known, that the barriers, policies and practices at its facilities violated disabled access requirements and standards and had a discriminatory impact upon Plaintiff and upon other persons with similar mobility disabilities, but Compass failed to rectify the violations, and presently continues a course of conduct in maintaining barriers that discriminate against Plaintiff and similarly-situated disabled persons.

260.    The acts and omissions of Compass, complained of herein, continue on a day-to-day basis, and have the effect of wrongfully excluding Plaintiff and other members of the public who are physically disabled, including but not limited to wheelchair users, from full and equal access to these public facilities. Such acts and omissions are the cause of humiliation and mental and emotional suffering of Plaintiff in that these actions continue to treat disabled Plaintiff as inferior and second-class citizens and serve to discriminate against her on the sole basis that she is a person with disabilities who requires the use of a wheelchair for movement in public places.

261.    Plaintiff would like to continue to attend Humboldt until she graduates from her undergraduate program and may also want to return to Humboldt for her graduate studies. Plaintiff is continuing to be damaged by the lack of access at the dining hall and areas of Humboldt under Compass' control and is deterred from attempting to access these areas as often as she would like, because the lack of access will foreseeably cause her further difficulty, discomfort and embarrassment. Plaintiff is unable, so long as such acts and omissions of Compass continue, to achieve equal access to and use of these public facilities. Plaintiff has a meal plan and will return to eating at the dining hall for nearly every meal once proper entrances, paths of travel, and seating is provided. However, Plaintiff cannot use the dining hall, its facilities, and areas of Humboldt under Compass' control as often as she wants to and is deterred from full-time patronage until these facilities are made properly accessible for disabled persons, including Plaintiff.

262.    As a result of the denial of full and equal access to the described facilities and due to the acts and omissions of Compass in owning, operating, leasing, constructing, altering, and

56

maintaining the subject facilities, Plaintiff has suffered a violation of her civil rights, including but not limited to rights under Civil Code sections 54 and 54.1, and has suffered difficulty, discomfort and embarrassment, and physical, mental and emotional personal injuries, including embarrassment, exhaustion and frustration, all to her damages per Civil Code section 54.3, including general and statutory damages, and treble damages, as hereinafter stated. Compass' actions and omissions to act constitute discrimination against Plaintiff on the basis that she was and is physically disabled and the fact that she is unable, because of the architectural and policy barriers created and/or maintained by Compass, in violation of the subject laws, to use the public facilities on a full and equal basis as other persons. The violations have deterred Plaintiff from returning to attempt to patronize the dining hall as often as she would like and will continue to cause her damages each day this barrier discrimination continues.

263.    Each and every violation of the ADA also constitutes a separate and distinct violation of California Civil Code section 54(c), thus independently justifying an award of damages and injunctive relief pursuant to California law, including but not limited to Civil Code sections 54.3 and 55.

264.    Further, each and every violation of the ADA also constitutes a separate and distinct violation of California Civil Code section 54.1(d), thus independently justifying an award of damages and injunctive relief pursuant to California law, including but not limited to Civil Code sections 54.3 and 55.

**SEVENTH CAUSE OF ACTION:**
**VIOLATION OF THE FEDERAL FAIR HOUSING ACT**
**[42 U.S.C. § 3601 *et seq.*]**
*(On Behalf of Plaintiff and Proposed Classes Against Defendant Trustees)*

265.    Plaintiff repleads and incorporates by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Amended Complaint and incorporates them herein by reference as if separately repled.

266.    Del Norte residence hall, where Plaintiff resides, is a "dwelling" available "to rent" within the meaning of the Fair Housing Act (FHA). 42 U.S.C.A. § 3602. It is a "covered multi family dwelling" under section 3604 (f)(7)(A).

57

267. Based upon the foregoing, the Trustees have violated the protections afforded to Plaintiff and the Proposed Classes under the FHA, including but not limited to, the following:

a. Failing and refusing to provide an accessible parking place near the entrance to the residence hall for Plaintiff to use;

b. Failing and refusing to make reasonable accommodations in policies, programs, and procedures when such is necessary to afford Plaintiff and the Proposed Classes an equal opportunity to use and enjoy the dwelling, including but not limited to providing an emergency evacuation plan in case of an elevator shutdown during said emergency; and

c. Failing and refusing to make the common use areas at the building readily accessible and useable by persons with disabilities.

268. The Trustees have actual and constructive knowledge that accommodations are necessary when the there is an emergency, and the elevator shuts down. The Trustees also had actual knowledge that Plaintiff is a person with a mobility disability who requires accommodation of having an evacuation plan when the elevator is not working.

269. When Plaintiff requested the reasonable accommodation of her disabilities by requesting that the Trustees provide her with an emergency evacuation plan to get her out of her third-floor dormitory room in case of an emergency which causes the elevators to shut down. The Trustees have refused to respond to her request for such a plan.

270. The Trustees maintain a pattern and practice of denying Plaintiff full and equal access to her dwelling by failure to maintain accessible paths or travel and failure to respond to requests for accommodations. 42 U.S.C.A. § 3604(f)(3)(B).

## **PRAYER FOR RELIEF**

1. Plaintiff has no adequate remedy at law to redress the wrongs suffered as set forth in this Amended Complaint. Plaintiff has suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiff is granted the relief she requests. Plaintiff and Defendants have an actual controversy and opposing legal positions as to Defendants' violations of the laws of the United

58

States and the State of California. The need for relief is critical because the rights at issue are paramount under the laws of the United States and the State of California.

WHEREFORE, Plaintiff individually and on behalf of the proposed classes she represents prays for judgment and the following specific relief against Defendants:

2.     Certify the proposed classes pursuant to Federal Rule of Civil Procedure 23;

3.     Issue a declaratory judgment that the Trustees' conduct has violated, and continues to violate, the ADA (42 U.S.C. § 12101 *et seq.*) and accompanying regulations; Section 504 (29 U.S.C. § 794) and accompanying regulations; and the FHA and accompanying regulations.

4.     Issue a declaratory judgment that Compass' conduct has violated, and continues to violate the ADA and accompanying regulations, as well as California law as described in the Fourth, Fifth, and Sixth Causes of Action above.

5.     Issue a preliminary and permanent injunction directing the Trustees, as current owner, operator, lessor, and/or lessee of the subject premises, and alternatively, as a governmental agency subject to Title II of the ADA, to modify the above described facilities at the property and other non-conforming facilities and related described facilities, and make appropriate policy changes, so that Plaintiff and similarly situated persons with disabilities may obtain the benefits of, and access to the Trustees' "programs, services and activities" in a "full and equal" manner as required by law; to properly *maintain* such accessible facilities once they are provided; and to train their employees and agents in proper sensitivity to and appropriate responses to the needs and rights of Plaintiff and other physically disabled persons and take all reasonable steps to accommodate their needs, including but not limited to warning all disabled members of the public of the lack of access they may face if they attempt to visit or obtain public services at any portion of these premises, before such barriers are removed;

6.     Issue a preliminary and permanent injunction directing Compass as a current owner, operator, lessor, and/or lessee of the subject property and premises to modify the above-described property, premises, policies and related facilities to provide full and equal access to all persons, including persons with physical disabilities; and issue a preliminary and permanent

injunction pursuant to ADA and the regulations incorporated therein, and pursuant to state law directing Defendants to provide facilities usable by Plaintiff and similarly situated persons with disabilities, and which provide full and equal access, as required by law, and to maintain such accessible facilities once they are provided; to cease any discriminatory policies; and to train Defendant Compass' employees and agents in how to recognize disabled persons and accommodate their rights and needs;

7. Order Defendants to alter their systemic policies, procedures, and practices to ensure that Plaintiff and the members of the putative classes receive equal access to the programs, services, and activities at CSU in compliance with all laws that protect such students;

8. Order Defendants to develop and implement a remedial plan that includes new systemic policies, practices, and procedures to ensure that all students in the putative classes are provided emergency evacuation plans;

9. Retain jurisdiction over the Defendants until such time as the Court is satisfied that Defendants' unlawful policies, practices, acts and omissions, and maintenance of physically inaccessible public facilities and policies as complained of herein no longer occur, and cannot recur;

10. Award to Plaintiff all appropriate damages, including but not limited to statutory damages, general damages, and treble damages in amounts within the jurisdiction of the Court, all according to proof;

11. Award to Plaintiff attorney fees, litigation expenses, and costs of this proceeding;

12. Award pre- and post-judgment interest as permitted by law; and

13. Grant such other and further relief as this Court may deem just and proper.

Date: March 4, 2022

PEIFFER WOLF CARR KANE CONWAY & WISE, LLP


_____/s/ Catherine Cabalo_____
By: CATHERINE CABALO, Esq.
Attorney for Plaintiff
CHRISTINE DiBELLA

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all claims for which a jury is permitted.

Date: March 4, 2022

PEIFFER WOLF CARR KANE CONWAY & WISE, LLP


_____ /s/ Catherine Cabalo
By: CATHERINE CABALO, Esq.
Attorneys for Plaintiff
CHRISTINE DiBELLA